STATE OF CONNECTICUT *v.* GREGORY BLUE
(A.C. 12143)

PETERS, C. J., CALLAHAN, BORDEN, BERDON, NORCOTT and KATZ, Js.

[1] Indeed, in this case there is an arbitration pending in New Jersey which involves the original lessor, Paint Works Corporate Associates-W, and the defendant, General Electric Company, and pertains to the same subject matter of this litigation—that is, the termination penalty of $543,760.

Decision released July 1, 1994*

*Neal Cone,* assistant public defender, for the petitioner (defendant).

*David J. Sheldon,* deputy assistant state's attorney, for the respondent (state).

PER CURIAM. This is a petition for certification to appeal to this court from the judgment of the Appellate Court affirming the trial court's judgment. The trial court, after accepting the defendant's plea of guilty, under *North Carolina* v. *Alford,* 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970), to one count of robbery in the first degree, and after denying the defendant's motions to withdraw his guilty plea, sentenced the defendant to a period of eight years incarceration, execution suspended after five years, and three years probation.

On appeal to the Appellate Court, the defendant challenged the trial court's acceptance of his plea and its denial of his motion to withdraw the plea. The Appellate Court summarily affirmed the judgment of the trial court. *State* v. *Blue,* 33 Conn. App. 941, 638 A.2d 1098 (1994). The defendant now seeks further review of the trial court's acceptance of his plea and its denial of his

---

* July 1, 1994, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

motion to withdraw the plea.[1] We have today ordered that certification be denied. *State* v. *Blue,* 230 Conn. 903, 644 A.2d 919 (1994).

Ordinarily, we do not explain the reasoning behind a denial of a petition for certification to appeal. In this case, however, we deem it appropriate to do so because the dissent mischaracterizes the trial court record and the law governing the trial court proceedings.

The issue raised by the petition for certification is whether the Appellate Court should have reversed the trial court's denial of the defendant's motion to withdraw his guilty plea. That motion arguably incorporated by reference an issue raised by a motion to disqualify counsel in which the defendant had raised his alleged inability to participate intelligently, knowingly and willingly in the plea canvass because he was, at that time, taking psychotropic medication. As a matter of law, the defendant cannot prevail because of *State* v. *Watson,* 198 Conn. 598, 504 A.2d 497 (1986). As a matter of fact, the record reveals that the trial court engaged in a thorough plea canvass to which the defendant responded appropriately and in some detail. Further, the record of the proceedings at the time of the motion to withdraw the plea supports the trial court's determination that the defendant understood the plea canvass.

---

[1] The two questions on which the defendant seeks review are: (1) "Whether the Appellate Court correctly decided that there was no error in the trial court's acceptance of [the] defendant's *Alford* plea and/or the trial court's refusing to let him withdraw said plea, the defendant having claimed that there was inadequate assurance that the plea was intelligently, knowingly and voluntarily made?"

(2) "Whether the Appellate Court correctly decided that there was no error to be found in [the] defendant's claim that the trial court failed to exercise its discretion to see if it seemed fair and just to allow [the] defendant to withdraw his plea?"

## I

The record discloses the following facts and procedural history. On September 29, 1992, in the trial court, the defendant, represented by counsel, entered a plea of guilty under the *Alford* doctrine to one count of robbery in the first degree in violation of General Statutes (Rev. to 1991) § 53a-134.[2] The plea bargain that the state disclosed to the court contemplated a sentence of incarceration of no more than eight years, with the defendant having the right to argue for less at the time of sentencing. Before accepting the defendant's plea, the court engaged in a lengthy canvass.

The transcript of the plea canvass discloses that the defendant answered many of the court's questions with responses that, although not eloquent, were appropriate and responsive to the questions posed to him.[3] The

[2] General Statutes (Rev. to 1991) § 53a-134 provides in relevant part: "ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon; or (3) uses or threatens the use of a dangerous instrument . . . ."

[3] For example, the defendant told the court that he had gone to school for "twelve years," and had graduated high school from "Weaver. Hartford." He told the court that his work record included "Carpentry" and "Off-set printing." When asked the nature of his illnesses, he stated: "Right now I'm being seen by a psychiatrist at Hartford Correctional. . . . Right now . . . I'm being seen by a psychiatrist in Hartford. And medical reasons. I'm seeing a doctor." When asked the name of the psychiatrist and the number of times he had seen the psychiatrist, the defendant answered: "There's several. Three. I only know one—Weiner. . . . Several times. . . . I don't know the amount." With respect to his medications, the defendant was able to tell the court that he took "Several. . . . About three different kinds, I think." When asked whether the doctor had told him the nature of his condition, he stated: "I couldn't understand it." He was able to tell the court, with respect to previous psychiatric treatment: "I had . . . at home, and in Hartford, in the Correction Center." When asked by the court whether he had any trouble understanding the court's questions, he responded: "I understand everything you asked me so far." When asked whether he understood everything his attorney had said to

court found the plea to have been entered voluntarily, knowingly, intelligently, and with a full understanding

him while discussing the case in the lockup, he said: "Most of it, yes . . . . I can't remember everything in detail." In discussing his need for medications, he stated: "I have black-outs and . . . some other thing, I don't know." When the court asked him whether he understood what the court explained as the maximum penalty for robbery in the first degree, the defendant stated: "I understand what you're saying, yes." At this point the transcript indicates that it was the "Court" that said "I understand what you're saying, yes." It is clear, however, from the response and its context that this was a typographical error, and that in fact the response was that of the defendant.

When asked by the court whether he was on parole, he correctly responded "Yes," and when asked how much time was left on his parole, he stated, "Yeah, about one year." In addition, when asked whether he was then being held on bail or as a sentenced prisoner, he correctly responded "Both," and when asked whether he understood that the court could impose its sentence in this case concurrent to the sentence for which he was on parole, he responded, "Now I do, yeah." By the time the defendant was ultimately sentenced in this case on December 9, 1992, he had completed serving the previous sentence.

Furthermore, upon being canvassed by the court regarding the medications he was taking, he indicated that, although all of the medications were then in his system, when the court asked him whether the medications made it more difficult or easier for him to understand the questions, he stated, "Well right now I understand," and, when asked whether he had any trouble understanding the court, he said, "I don't think so." In addition, when asked whether he remembered the names of the medications, he said, "No. I think I have a few names written down." His attorney then read the names to the court. The court then asked: "Okay. But you don't have any problem understanding me. I'm trying to be as clear as possible, but I want you to tell me if you don't understand any question. You with me so far?" The defendant answered, "Yes."

In addition, the defendant responded appropriately to all of the other questions of the court during the canvass. In appropriate "Yes" and "No" answers, the defendant indicated his understanding that, by pleading guilty, he gave up his rights to a trial, to silence, to face and cross-examine his accusers, and to require the state to prove him guilty beyond a reasonable doubt. He indicated further that, although he was pleading guilty under the *Alford* doctrine, he did not agree with all of the facts of the crime stated by the prosecutor, that he understood he would probably be found guilty upon a trial, and that he had discussed the evidence with his attorney. He indicated to the court that he understood that: the "dangerous instrument" claimed by the state to have been used in the course of the robbery was a razor knife; the state would recommend a ceiling of eight years, but that

of the charges and consequences. Significantly, insofar as the record discloses, neither person in the courtroom charged with responsibility for protection of the defendant's rights—the judge, who observed the defendant as he went through the canvass, or the defendant's attorney, who had spoken with the defendant before the entry of the plea and stood with him as he entered the plea—had any perception that, despite the presence in his system of medications, the defendant did not understand what he was doing. Indeed, this record is, at the least, susceptible of the inference that the medications helped, rather than hindered, the defendant in understanding the proceedings and their consequences for him.[4]

On October 28, 1992, the defendant filed a pro se "Motion To Dismiss Counsel," dated October 22, 1992.[5] This motion raised four substantive grounds of dissatisfaction with counsel: (1) failing to advise the defendant of a purported mandatory, nonsuspendable sentence under General Statutes § 53a-35a; (2) "ill-advis[ing] the defendant by having him plea[d] guilty under the influence of mind altering drugs"; (3) failing to inform the

he and his attorney could argue for less; if the court were inclined to impose more than eight years, he would have the right to withdraw his guilty plea and go to trial; although he did not agree with the state's recommendation, it was in his best interest to enter the plea bargain; the court could impose the sentence either consecutive or concurrent to his present sentence; and, if he were not a United States citizen, his right to remain in .the United States could be affected by the plea. Finally, the defendant indicated to the court that his plea was voluntary and of his own free will, and that he had no questions of the court.

[4] That inference, if it were to be drawn, would also be supported by the statement in the report of the defendant's psychiatric expert, who evaluated him for purposes of sentencing, that the defendant's "disorder of a schizophrenic or schizoaffective nature . . . is fairly controlled by psychotropic medication, Trilafon, Mellaril and Stelazine."

[5] Although technically this motion only sought to dismiss the defendant's counsel and for the court to appoint new counsel to represent him, because of the substance of the allegations made in the motion we consider it also as a motion to withdraw his earlier guilty plea.

court of a request for a psychiatric evaluation and a "determination for CADAC";[6] and (4) misinforming the defendant "about his felony record conviction."

The next court proceeding was on November 17, 1992. The defendant's attorney noted that he had just recently seen the defendant's pro se motion to withdraw the plea, and that the attorney was preparing a motion to withdraw the plea. The attorney also indicated that a psychiatrist had evaluated the defendant, and that the psychiatric report would be ready in approximately two weeks. The attorney made clear, however, that he had retained the psychiatrist for purposes of the sentencing, irrespective of the result on any motions to withdraw the defendant's plea. The attorney therefore requested that all proceedings, including sentencing if the motions were denied, be continued to December 9. The court continued the case to December 9, without ruling on the defendant's motion.

Before doing so, however, the court addressed the defendant directly about the matters raised in his pro se motion. The court asked the defendant whether he had a copy of the motion. The defendant responded, "Just a minute, sir." The court then directed the defendant to his claim that his attorney had not advised him regarding the mandatory minimum sentence required by § 53a-35a, and the defendant responded, "Yes. That's correct Your Honor." The defendant then acknowledged that "Me and my counsel discussed that this morning," and after his attorney explained that he would not be sentenced under that provision, the defendant indicated that he understood that.

The court also specifically addressed the defendant's claim for an evaluation for CADAC. The defendant stated: "I had requested an evaluation for CADAC. Okay? . . . Requested of my counsel. . . . From my

---

[6] This is a reference to the Connecticut alcohol and drug abuse commission.

counsel, I requested it. To have a CADAC evaluation."
In the course of this colloquy, the court asked the
defendant whether he had been evaluated for CADAC
in a 1990 case. The defendant responded: "Someone
came and . . . I don't know exactly what it was, but
someone came to see me. . . . I never remember
using CADAC . . . ." The court then directed the
defendant's attorney to determine what had occurred
in the 1990 proceeding.

With respect to the defendant's claim that his attor-
ney had misinformed him regarding his felony convic-
tion record, it became clear that certain information
in the presentence investigation report was incorrect.
This information was that the defendant had numer-
ous prior convictions under ten different aliases. The
court and the defendant engaged in a lengthy colloquy,
in which the defendant, responding appropriately and
at length to the court's inquiries, denied that he was
the person named in those aliases.[7] The court stated
that it would contact the probation department per-
sonally in order to clear up this confusion.

___

[7] For example, the defendant stated: "I . . . excuse me. I seen that also.
I never . . . I guess it's just something that the police or whoever just
decided just to give them all to me. Cuz I never used the names. I never
been arrested on those names or remember using them names at all. . . .
I never used those names at all. . . . None." Indeed, one of the names
was Darrell Bunkley, who was serving a twenty-two year sentence for man-
slaughter. See State v. Bunkley, 202 Conn. 629, 522 A.2d 795 (1987). When
the judge indicated that he knew Bunkley, the defendant stated: "Yeah
I know. I know Darrell Bunkley too. . . . Yeah, I definitely wouldn't use
his or Clifford [Bunkley's] name." The defendant then volunteered, regard-
ing another purported alias, Jan E. Johnson, that "I know. I've seen this.
This has been on there a few years. And ummm. Jan Johnson . . . that's,
I thought it was a girl's name. And, well, I'm not familiar with none of
them. I don't know why they got . . . you know, I don't know how they
got like that. So, sometimes the police just give you the names as aliases."
The defendant restated his claim that his attorney had misinformed him,
as follows: "At the time [of the plea] I felt I was coerced, I was led. I felt
I pleaded guilty because of the fact that the way it was brought to me about
my criminal record, that I was convicted of a large amount of felonies; and

With respect to the defendant's claim that he had pleaded guilty under the influence of mind altering drugs, the defendant asserted that he had been coerced into pleading guilty by his attorney. When the court questioned why he had not indicated that fact during the canvass, the defendant stated: "Because, like I said, I was on drugs, okay?" The following colloquy then took place:

"The Court: Are you talking about the drugs that we discussed during the canvass on that day?

"The Defendant: Yes sir, yes.

"[Q.] You indicated to me very clearly in a transcript, which I read this morning, bears out that you indicated to me, in response to my questions, that you understood my questions.

"[A.] Well see . . . but, I'm going to tell you, that sometime the drugs that I was on or the drugs that they give me have me submit or commit myself to saying things or doing things that I'm not aware of. And I was trying to . . . .

"[Q.] All right. That's what you mean by number two, in your Motion to Dismiss Counsel, is that right? . . . That's what you're talking about.

"[A.] Yes."

The defendant did not further pursue his motion to dismiss counsel. Instead, by motion dated December 8,

---

at the time I was threatening to being considered for [prosecution as a persistent felony offender]." Although his attorney acknowledged that the state's information of twenty-three felony convictions, which he had not challenged, was incorrect, the attorney also asserted his belief, on the basis of what he believed to be the correct felony convictions, that the defendant "did have exposure as a persistent felony offender" and that this was a consideration in accepting the plea bargain. The defendant then volunteered: "And another thing that I'd like to bring out too, that record, 1970-71, I think some of that is. I was fourteen, thirteen, fifteen years old. . . . I want to say it couldn't have been me."

1992, and accompanied by a memorandum of law in support thereof, the defendant's attorney moved, on behalf of the defendant, to withdraw the defendant's plea. These motion papers did not rely on any claim that the defendant had been under the improper influence of drugs at the time of the plea. The sole basis for this motion was the claim that the court had been required by Practice Book §§ 711 and 721 (1) to advise the defendant of the mandatory one year minimum sentence provided by General Statutes § 53a-35a. In the memorandum, the attorney stated that he had "carefully reviewed the transcript of the judicial canvass and is of the opinion that the Court never made the Defendant aware of the mandatory minimum sentence for Robbery 1st Degree."

The defendant's attorney filed his motion when the parties appeared in court the next day, December 9, 1992. The attorney stated: "I'm prepared to move forward on a motion to withdraw plea for my client. If I am unsuccessful, Your Honor, I'm prepared to move forward on sentencing today." The attorney then argued that the court's failure to advise the defendant during the plea canvass of a mandatory minimum sentence of one year under § 53a-35a rendered the plea invalid. The attorney also stated, however, that *"I realize that my client was aware of the plea agreement of eight years with the right to argue for less,* and I think my client was not so naive to believe that he would walk out of here without any type of imprisonment, but the Practice Book section must be adhered to strictly, and, therefore, Your Honor, I feel my client does have a right to withdraw his plea." (Emphasis added.) The court repeated its earlier findings that the defendant had knowingly and voluntarily entered his guilty plea and agreed to an eight year ceiling on his sentence, and found also that a denial of the motion to withdraw would not result in any manifest injustice. Accordingly, the court denied the motion to withdraw the plea filed

by the defendant's attorney.[8] The defendant's attorney then stated that he was "prepared to move forward on sentencing remarks."[9]

All the parties—the defendant, his attorney, the state and the court—then turned their attention to the matter of sentencing. The defendant's attorney made a lengthy plea for leniency. In the course of his remarks, he referred to the report of John H. Felber, a psychiatrist who had evaluated the defendant on November 17, 1992, three weeks after the defendant prepared his pro se motion to withdraw his plea. The attorney also referred to a statement of the attorney's wife, whom he represented to be a nurse practitioner, who had not examined the defendant, regarding the defendant's medications. The purpose of these references was not to support a claim for withdrawal of the defendant's plea, but to support a plea for leniency by the court in sentencing the defendant. Indeed, using Felber's report for support, the attorney stated: "Now, I understand society wanting to warehouse mentally ill people who are a threat to society who exhibit antisocial behavior, but I think society would not be so quick to keep people like [the defendant] away if they can con-

[8] The defendant does not raise the propriety of that ruling in this petition for certification.

[9] The record does not disclose that the court ever took formal action on the defendant's pro se motion to withdraw his plea, because (1) neither the defendant nor his attorney brought that motion to the court's attention at that time, and (2) the denial of his attorney's motion to withdraw the plea was followed immediately by the sentencing proceedings, in which the defendant participated personally. Nonetheless, for purposes of the defendant's petition for certification, we consider the court's denial of the attorney's motion to withdraw the plea to be an implicit denial of the defendant's pro se motion, because the court's findings regarding the voluntariness of the defendant's plea necessarily encompassed a rejection of his claim that he had been under the improper influence of drugs at the time of his plea. It is relevant to that claim, however, that the defendant, who, in contrast to his attorney, was the one to make that claim, at no time during the proceedings on December 9, 1992, returned to his earlier assertion that he had not pleaded guilty voluntarily because of the influence of his medications.

trol his behavior. This, as far as I know, is the first time that he was on prescribed medication. From all reports, he's not been any problem in jail. He's under control of these drugs. He may very well be salvageable. I ask the court to take that into consideration."

Felber's report, which we have examined, indicated that the defendant "has been drug dependent on cocaine, heroin, crack, halcion and alcohol for more than ten years. In addition, he suffers from a psychotic disorder of a schizophrenic or schizoaffective nature. *This illness is fairly controlled by psychotropic medication, Trilafon, Mellaril and Stelazine.*" (Emphasis added.) The report also indicated that the defendant "committed the criminal offenses with which he has been charged, in order to pay for narcotics and satisfy his addiction." Felber also stated that the defendant's "psychotic disorder *has never been* thoroughly explored, *diagnosed* and treated." (Emphasis added.) He stated that the defendant was a "seriously ill patient who is in need of extensive inpatient evaluation and therapy." Although Felber's report describes the defendant's illness, it does not suggest that because of his medications, the defendant had been incapable of understanding and voluntarily engaging in the plea proceedings on September 29.

The defendant personally participated in the sentencing proceedings. We first note that at no time did the defendant, either personally or through his counsel, reassert his earlier claim that his plea had been involuntary because of the effect of his medications. He did, however, personally address the court, both orally and in writing.

Orally, the defendant asked the court for leniency because "I never had any violent acts before in my life against anyone, and that although the guy said that I pulled out the knife, I don't—I can't concentrate what

happened because I pleaded guilty, but the knife fell out of my pocket, and the knife was seen. That's what happened. I never drew the knife on anybody to hurt anyone. . . . *It started off as a larceny sixth. Because of the display of the knife, it changed—it made it to robbery,* and I would like it to be considered." (Emphasis added.)

Furthermore, the defendant also presented to the court a seven page handwritten letter, which the court examined, as have we. Significantly, although this letter was not filed with the court until December 9, it is dated "10/16," six days prior to October 22, 1992, the date of the defendant's pro se motion to withdraw his plea. Although in that motion he, for the first time, had claimed involuntariness of his plea because of his medications, nowhere in his seven page handwritten letter did the defendant even refer to the circumstances of his plea of guilty.

Before imposing sentence, the trial court addressed the defendant personally, and asked whether he had anything to add. The defendant responded: "No, just want to add, you know, that being incarcerated I lost a lot, you know, and I lost my family that I had custody of. I had a custody suit filed against me . . . while I'm incarcerated, and I also lost—I'm losing—I lost that, having custody of my children. I also lost a lot of other things while I was incarcerated, and I've been incarcerated fifteen months on this. I'd like that to be considered."

In imposing sentence, the court asked the defendant: "[The court] is going to require you . . . to get some inpatient treatment when you are discharged from prison. You understand that?" The defendant answered, "Yes." The court then imposed a sentence of eight years incarceration, execution suspended after five years, followed by three years of intensive probation,

with special conditions of probation regarding psychiatric and substance abuse evaluation and treatment. In response to a question by the court, the defendant also indicated that he was then taking his medications.

## II

The point of this lengthy and detailed recitation is that this record convincingly rebuts the defendant's claims in his petition for certification and the dissent's selective reading of the record in support thereof. The only suggestion in this record to support the defendant's principal claim—that his plea of guilty was involuntary because he had taken his medications—is the defendant's unsupported statement to that effect to the court on November 17, 1992. When viewed in the context of the entire record, however, that unsupported statement is simply insufficient to raise a legitimate question, adequate to invoke our certification discretion, as to whether the trial court: (1) should not have accepted, or should have permitted the defendant to withdraw his plea; or (2) should have required sua sponte an evidentiary hearing into the defendant's competence to enter the plea.

First, it is explicit on this record that the defendant had taken his medications both on September 29, when he entered his plea, and on December 9, when he was sentenced. We can fairly presume that the same was true for November 17. Nonetheless, in all three court appearances the defendant engaged in appropriate and considerable dialogue with the court, and did so in terms not limited to monosyllables, the dissent's suggestion to the contrary notwithstanding. Indeed, after having taken his medications, the defendant was clear enough in his mind to: (1) engage in the lengthy plea canvass; (2) give the court an account of his work and educational history; (3) request a CADAC evaluation; (4) engage in a detailed and appropriate denial of the

state's claims regarding his prior record and alleged aliases; (5) prepare, after the plea proceedings, a lengthy letter to the court pleading for leniency but not asserting that he had not understood what he was doing when he pleaded guilty; (6) make an appropriate oral plea for leniency in sentencing, again, without asserting that he had not known what he was doing when he pleaded guilty; and (7) inform the court that his offense had "started off as a larceny sixth" but that "[b]ecause of the display of the knife . . . made it to robbery . . . ."

Second, the defendant's attorney had spoken to the defendant prior to the plea proceedings on September 29, was with him in court during those proceedings and, according to his representation to the court, planned to confer further with the defendant immediately after those proceedings. Yet the attorney's claims on behalf of his client are significantly devoid of any support for the defendant's claim that his plea was involuntary because of the medications. Indeed, when his attorney, subsequent to his conversations with the defendant at the time of his plea and subsequent to the defendant's pro se motion, filed and argued his motion to withdraw the defendant's plea, that motion was confined to an assertion that the plea had been involuntary because of a failure to notify the defendant of a minimum mandatory sentence. Moreover, none of the attorney's references to the defendant's mental state, including the attorney's reliance on his wife's opinion and on Felber's report, was made in the context of a claim that the defendant's plea had been involuntary. In the context of the entire course of the trial court proceedings, there is a telling divergence between the defendant's assertion on November 17 and his attorney's efforts on his behalf.

Third, Felber's report, which was the result of his evaluation of the defendant at the courthouse on

November 17, the same day the defendant appeared in court, is also telling. Significantly absent from that report is any indication that the defendant had been unable to understand the nature of the proceedings when he pleaded guilty on September 29. Instead, the report relies on a detailed history, presumably obtained by Felber from the defendant, of his family, health, educational, criminal and substance abuse histories, and states, again presumably based on information given to Felber by the defendant, that the defendant "committed the criminal acts with which he has been charged, in order to pay for narcotics and satisfy his addiction." Although Felber gave his opinion that the defendant "suffers from a psychotic disorder of a schizophrenic or schizoaffective nature," a phraseology that the defendant has not sought to explain, Felber also noted that: (1) the defendant's illness is controlled by his medications; and (2) his "psychotic disorder has never been thoroughly . . . diagnosed . . . ." In sum, the record does not indicate that the defendant did not have the capacity to enter a voluntary and intelligent plea.

With respect to the law governing this case, it is clear that, were we to grant the defendant's petition, the case would be controlled by *State* v. *Watson,* 198 Conn. 598, 504 A.2d 497 (1986), and decided adverse to the defendant. Consequently, there is no point in granting the defendant's petition for certification.

"A defendant who challenges the validity of his guilty plea for lack of an evidentiary inquiry into his competence must make a showing that, at the time of his plea, the court had before it specific factual allegations that, if true, would constitute substantial evidence of mental impairment. *Sanders* v. *United States,* 373 U.S. 1, 21, 83 S. Ct. 1068, 10 L. Ed. 2d 148 (1963). Substantial evidence is a term of art. Evidence encompasses all information properly before the court, whether it

is in the form of testimony or exhibits formally admitted or it is in the form of medical reports or other kinds of reports that have been filed with the court. Evidence is substantial if it raises a reasonable doubt about the defendant's competency . . . . *Moore* v. *United States,* 464 F.2d 663, 666 (9th Cir. 1972)." (Internal quotation marks omitted.) *State* v. *Watson,* supra, 198 Conn. 605.

"[I]n considering whether to hold an evidentiary hearing on a motion to withdraw a guilty plea the court may disregard any allegations of fact, whether contained in the motion or made in an offer of proof, which are either conclusory, vague or oblique. For the purpose of determining whether to hold an evidentiary hearing, the court should ordinarily assume any specific allegations of fact to be true. If such allegations furnish a basis for withdrawal of the plea under [Practice Book] § 721, and are not conclusively refuted by the record of the plea proceedings, and other information contained in the court file, then an evidentiary hearing is required. See *State* v. *Lasher,* 190 Conn. 259, 266, 460 A.2d 970 (1983)." (Internal quotation marks omitted.) Id., 612–13.

In *Watson,* we rejected a similar claim that the trial court should have held an evidentiary hearing on the defendant's motion to withdraw his guilty plea under *Alford.* In this case, as in *Watson:* (1) the information relied on by the defendant was elicited by the court during its plea canvass; (2) no medical report suggested that the defendant had been unable to understand the nature of the plea proceedings; (3) neither the defendant's crime nor his demeanor at any time indicated irrationality or inappropriate affect; (4) the defendant's attorney had not at any time raised any question regarding the defendant's competence or put the defendant's mental state in issue; (5) the defendant's responses, both at the plea canvass and throughout the

ensuing proceedings, indicated a full understanding of all of the proceedings; (6) the defendant's claim on appeal, based on the purported effect of his medications, was not the principal focus of his efforts to withdraw his plea in the trial court; and (7) neither the defendant nor his counsel suggested to the court that an evidentiary hearing was in order. Finally, the defendant's claims are sufficiently refuted by the entire record of the trial court proceedings.

The petition for certification is denied.

BERDON, J., dissenting. The court, by failing to grant certification[1] in this case, underscores the increasing irrelevance that mental illness has today in the criminal law of this state. The fact that this court will let stand a trial court's acceptance of the defendant's plea that led to a finding of guilt when he was probably mentally ill and certainly heavily medicated with psychotropic drugs greatly troubles me. This injustice was further compounded by the trial court's refusal to allow the defendant to withdraw his plea.

The majority claims that this opinion mischaracterizes the trial court proceedings. Although the majority has reprinted a substantial portion of the trial court record, I believe that the lengthy quotes relied on by the court indicate that it has missed the point raised by the defendant's claim. Apparently, the majority believes that the purpose of this dissent is to prove the

[1] The issues the defendant presented in his petition for certification are as follows: (1) "Whether the Appellate Court correctly decided that there was no error in the trial court's acceptance of [the] defendant's *Alford* plea and/or the trial court's refusing to let him withdraw said plea, the defendant having claimed that there was inadequate assurance that the plea was intelligently, knowingly and voluntarily made?"

(2) "Whether the Appellate Court correctly decided that there was no error to be found in [the] defendant's claim that the trial court failed to exercise its discretion to see if it seemed fair and just to allow [the] defendant to withdraw his plea?"

defendant's insanity, and the majority accordingly relies on various colloquies that it believes are inconsistent with an insane mind. The reason that I would grant certification, however, is not a claim that the defendant has somehow proved, based on a cold record, that he was incompetent at the time of his plea. The defendant makes no such claim. Instead, I would grant certification because the circumstances before the trial court, as set out in this dissent, raised a troubling question of whether the defendant had the mental capacity to enter a guilty plea *at the time of his plea*[2] and, therefore, as a matter of law, the trial court should have either allowed the defendant to withdraw his plea or held an evidentiary hearing to determine whether he had been competent to enter a plea.

On October 28, 1992, the defendant appeared before the trial court to enter a plea under the *Alford* doctrine[3] to one count of first degree robbery under General Statutes § 53a-134. The trial court conducted a plea canvass pursuant to Practice Book §§ 711 through 713. The purpose of this canvass is to advise the defendant of his constitutional rights and ensure that the defendant is knowingly, voluntarily and intelligently waiving

---

[2] I note that the majority, to bolster its claim that the defendant was competent to enter a plea, relies on colloquies between the defendant and the trial court that took place weeks after the defendant appeared before the trial court and pleaded guilty. The appropriate focus is, of course, on the circumstances indicating the defendant's competency at the time of his plea. I cannot join the majority in its view that the defendant's answers to various questions on November 17 and December 9, 1992, indicating, among other things, an apparent surface understanding of the law of larceny, are sufficient to prove that he was competent to plead guilty in September of that year when he was under potent psychotropic medication. Instead, I find that the question is sufficiently in doubt and that the trial court should have allowed the defendant to withdraw his plea or conducted a hearing to determine the reliability of that plea.

[3] "An *Alford* plea allows a defendant in a criminal case to consent to punishment as if he were guilty without his express acknowledgment of his guilt." *State* v. *Watson,* 198 Conn. 598, 601 n.3, 504 A.2d 497 (1986); see *North Carolina* v. *Alford,* 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

those rights. During this canvass, the trial court asked the defendant questions about his personal background, which the defendant answered. The trial court also asked the defendant: "Do you suffer from any illnesses of any sort?" The defendant answered in the affirmative. In the subsequent colloquy, the defendant indicated that he was being seen by a psychiatrist at Hartford Community Correctional Center, and had been prescribed three medications by the psychiatrist, "Benedyl," "Malleril," and "Tryliquon."[4] Furthermore, the defendant indicated that he was on *all three* medications at the time of this hearing. The defendant answered "yes" to the trial court's suggestions that one of these drugs was to help him sleep, and another was a tranquilizer. As for the third drug, the defendant could only state: "I have black-outs and . . . some other thing, I don't know." At this point, the trial court stated: "Okay. All right. Do you understand that when you plead guilty you give up your right to a trial . . ." and other questions designed to determine if the defendant understood his rights. The defendant responded with "yes" and "no" answers. The trial court then accepted the defendant's plea and continued the matter for a presentence investigation and report.

At the next appearance, on November 17, 1992, the defendant filed two pro se written motions to withdraw his plea and discharge his attorney. The first pro se motion indicated that the plea was invalid because the defendant was "unable to comprehend the procedure before the court and the nature of the charges." The second pro se motion stated more directly that his attorney had "ill-advised the defendant by having him plea[d] guilty under the influence of mind altering drugs" and had "neglected to inform the Court that there was a request for psychiatric evaluation and determination

---

[4] The transcript of the plea canvass indicates that "Malleril" and "Tryliquon" were phonetic spellings. See footnote 5.

for [the Connecticut alcohol and drug abuse commission].'' The defendant's attorney also indicated his intention to file a motion to withdraw the defendant's plea, and asked for a continuance for this purpose. The attorney informed the court that the defendant had been psychiatrically evaluated that day, and the psychiatrist was preparing a report.

The trial court stated that he would not hear the various motions or proceed with sentencing until the next court date so that the report would be available. The state requested that the pro se motion to dismiss counsel be heard immediately to prevent unnecessary delay. In response to the court's inquiry with regard to this motion, the defendant stated that he had been ''coerced'' into his plea because he had been on drugs at the time of the plea. The trial judge indicated that he had read the transcript of the plea canvass and stated to the defendant: ''You indicated to me . . . in response to my questions [at the canvass], that you understood my questions.'' The defendant answered: ''Well see . . . but, I'm going to tell you, that sometime the drugs that I was on or the drugs that they give me have me submit or commit myself to saying things or doing things that I'm not aware of. And I was trying to . . . .'' The trial court interrupted the defendant and stated: ''All right. That's what you mean by number two, in your Motion to Dismiss Counsel, is that right? . . . That's what you're talking about.'' The defendant answered: ''Yes.'' The trial court then stated that it was not going to rule on the motions until the next hearing date.

On December 9, 1992, the defendant returned to court. The presentence investigation report contained the psychiatric evaluation. It indicated that the defendant had been severely drug dependent for more than ten years, and suffered from a ''psychotic disorder of a schizophrenic or schizoaffective nature,'' for which

the defendant was prescribed "psychotropic medication, Trilafon, Mellaril and Stelazine."[5] The report concluded that the defendant was "a seriously ill patient who is in need of extensive inpatient evaluation and therapy" and strict outpatient monitoring, medication, counseling and drug screening following "a prolonged hospital stay." Nevertheless, the defendant's attorney did not address the issue of the defendant's competency to enter a plea, instead merely arguing that the trial court should allow the withdrawal of the plea because it had failed to advise the defendant as to a mandatory minimum sentence. The defendant did not speak. The trial court proceeded to sentencing, and only then did the defendant's attorney refer to the report, characterizing the defendant as "severely mentally ill" based on a discussion he had engaged in with his nurse-practitioner wife regarding the identity and daily dosages of the psychotropic drugs his client had been prescribed.[6] The trial court sentenced the defendant to a term of imprisonment of eight years, suspended after five, with mandatory inpatient evaluation and

---

[5] In all probability, the "Tryliquon" and "Malleril" referred to in the transcript of the plea canvass; see footnote 4; were the "Trilafon" and "Mellaril" of the psychiatrist's report. By reference to the Physician's Desk Reference, the trial court could have determined that "Trilafon," "Mellaril," and "Stelazine" are prescription medications for the "management of the manifestations of psychotic disorders." Physician's Desk Reference (48th Ed. 1994) pp. 2172, 2058, 2279.

[6] Defense counsel stated to the trial court: "I've looked closely at [the psychiatrist's] report as well which I've submitted to the court, and it just so happens that I read this report on Monday evening when I was at home. I noticed that [the defendant] is on medication Trilafon, Mellaril and Phenelzine. Ordinarily, I do not discuss these cases with my wife, but she is a nurse practitioner, somebody who administers diagnosis, who handles medications every day, and I said, what are these medications. She quickly agreed with what [the psychiatrist] had said, they're very strong psychotropic medicines. She was surprised that anybody would be on all three. She was surprised at the level of the dosages which are shown in [the defendant's] medical report. She said, your client is severely mentally ill." Defense counsel presumably was referring to the "Stelazine" referenced in the report when he said "Phenelzine."

treatment following release from prison. The trial court did not address either of the pro se motions filed by the defendant on November 17, 1992.

"Because every valid guilty plea must be demonstrably voluntary, knowing and intelligent, we require the record to disclose an act that represents a knowing choice among available alternative courses of action, an understanding of the law in relation to the facts, and sufficient awareness of the relevant circumstances and likely consequences of the plea." *State* v. *Watson,* 198 Conn. 598, 604, 504 A.2d 497 (1986); see General Statutes § 54-56d (a) (establishing competency standard for criminal proceedings); *Dusky* v. *United States,* 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960). During the plea canvass, the trial court was informed that the defendant was receiving psychiatric treatment and had been on three different medications at the time of the plea. These representations gave the trial court "reason to suspect" that the defendant's psychiatric problems and the three medications he had taken "might impinge upon the accused's capacity to enter a voluntary and intelligent plea." *United States* v. *Parra-Ibanez,* 936 F.2d 588, 595 (1st Cir. 1991); see *Spikes* v. *United States,* 633 F.2d 144, 145 (9th Cir. 1980), cert. denied, 450 U.S. 934, 101 S. Ct. 1399, 67 L. Ed. 2d 369 (1981). Therefore, the trial court had an independent duty, under *Pate* v. *Robinson,* 383 U.S. 375, 384–85, 86 S. Ct. 836, 15 L. Ed. 2d 815 (1966), to order, on its own, an evidentiary hearing, or at least make some reasonable further inquiry; *United States* v. *Cole,* 813 F.2d 43, 47 (3d Cir. 1987); for the purpose of determining, under the circumstances, whether the defendant could knowingly, voluntarily and intelligently waive his constitutional rights by pleading guilty under the *Alford* doctrine.[7]

---

[7] The majority believes that this inquiry was unnecessary, in part because neither the trial court nor the defendant's attorney "had any perception

The trial court, however, neither called for an evidentiary hearing nor made reasonable inquiry at any stage of these proceedings. It did not "inquire what dosages of [the three psychotropic medications the defendant] . . . had ingested and what effects, if any, such medications might be likely to have on [the defendant's] clear-headedness." *United States* v. *Parra-Ibanez,* supra, 936 F.2d 596. The trial court's questions addressed to the defendant regarding his ability to understand the proceedings and the defendant's generally monosyllabic answers to these questions *at the time his plea was accepted* constitute a wholly inadequate substitute for a full inquiry into the defendant's capacity knowingly, voluntarily and intelligently to waive his constitutional rights. "[A] court may not rely on the defendant's subjective appraisal of his own capacity or on the court's personal observations of the defendant" when there are factual allegations that, if true, would require a *Pate* hearing. *State* v. *Watson,* supra, 198 Conn. 605.[8]

---

that, despite the presence in his system of medications, the defendant did not understand what he was doing" and the record is "susceptible of the inference that the medications helped, rather than hindered, the defendant in understanding the proceedings and their consequences for him." Again, the court holds the defendant to a burden of proving his insanity based on a cold record. From that skewed perspective, the majority could uphold any plea proceeding. The defendant's burden, however, is simply to raise a sufficiently serious question regarding his competency to enter a plea that the trial court should have either allowed him to withdraw his plea or ordered an evidentiary hearing. Had the trial court held such a hearing, it would have had a meaningful basis for its "perception" regarding the defendant's understanding of the proceedings. Furthermore, had the trial court held such a hearing, there would be no occasion to discuss the questionable "inference" divined from the record by the majority that the medication helped the defendant in understanding the proceedings.

[8] The majority relies on this court's decision in *State* v. *Watson,* supra, 198 Conn. 598, upholding a trial court's failure to hold a competency hearing and subsequent denial of a request to withdraw a plea where the defendant had been treated by a psychiatrist and taking medication.

I recognize that *Watson* sets a high standard, requiring "substantial evidence of mental impairment" to be shown before a trial court assumes an

Even if the trial court acted within its discretion in accepting the defendant's plea without holding an evidentiary hearing to inquire into the effects of the defendant's mental illness and medications on the voluntariness of the plea, the trial court should have granted the defendant's motion to withdraw his plea. A defendant is allowed as of right to withdraw a plea if "[t]he plea was involuntary . . . ." Practice Book § 721 (2). In the November proceeding, the trial court learned that the defendant had been evaluated by a psychiatrist that day, and the defendant represented through written motion and oral statement that he wished to withdraw his plea and discharge his attorney because the attorney gave him poor advice and allowed him to plead while heavily medicated and unable to comprehend the proceedings. In the December proceeding, the trial court had before it the promised psychological evaluation, which clearly indicated that the defendant was mentally ill and confirmed that the defendant had been taking three different psychotropic

---

affirmative duty of holding a hearing to ascertain the defendant's competency to enter a plea. Id. I do not, however, believe that this standard is an appropriate interpretation of our statutory, Practice Book and constitutional safeguards regarding the necessity that a plea be the product of a knowing, voluntary and intelligent decision by a competent defendant. See, e.g., *United States* v. *Parra-Ibanez*, supra, 936 F.2d 595 (interpreting Rule 11 of the Federal Rules of Criminal Procedure and reversing conviction because the trial court did not make searching inquiry after the defendant stated at canvass that he had " 'been under the care of a doctor for a mental or emotional condition,' " and had, within the previous twenty-four hours, taken three medications); *United States* v. *Cole*, supra, 813 F.2d 46. Therefore, regardless of whether the defendant would "prevail" under *Watson*, I would grant certification so that this court could reevaluate the standard set out in that case. As this court pointed out in *Statewide Grievance Committee* v. *Whitney*, 227 Conn. 829, 843 n.22, 633 A.2d 296 (1993), plea bargaining is an important element of our system of criminal justice. To protect the integrity of these proceedings, at which defendants waive fundamental constitutional rights, we should set a reasonable standard governing the duty of trial courts to inquire into the competency of defendants who seek to plead guilty.

drugs.[9] At both of these proceedings, the trial court had sufficient evidence before it to question the defendant's competency at the time of the plea canvass. Under the circumstances, the trial court should have "followed the universal practice in this State . . . to exercise . . . discretion in favor of the accused, and to permit him to change his plea and have a jury decide the question of his guilt." (Internal quotation marks omitted.) *State* v. *Brown,* 157 Conn. 492, 497, 255 A.2d 612 (1969).

Finally, the fact that the defendant had pleaded under the *Alford* doctrine makes it particularly unjust to uphold this conviction. The defendant was *not* admitting that he was guilty of the crimes charged. Instead, an *Alford* plea represents a strategic choice in view of a defendant's chances of prevailing at trial given the state's factual basis for the plea, the exposure to imprisonment on the charged crime, the potential for the state to file other charges and all other relevant circumstances. This strategic choice is little more than a farce if the defendant was incompetent at the time he made the decision to plead.[10]

---

[9] The state argues that the defendant did not raise, at the December hearing, his mental illness and medicated status as a ground for withdrawing his plea. Nevertheless, the trial court had the psychiatrist's report and the defendant's written pro se motion to withdraw his plea, which had not been acted on. I cannot uphold the conviction of a person on the ground that his appointed counsel acquiesced in the proceedings—particularly in light of the defendant's pro se motion to dismiss his counsel which stated that his plea was involuntary because the defendant had been under the influence of "mind-altering drugs."

[10] This is particularly so in view of the fact that a colloquy between the state, defense counsel and the trial court indicated that the defendant's criminal record was composed of crimes under various aliases that the state charged to the defendant, but it was unclear how many were accurate, and therefore it was unclear whether the defendant was exposed to a serious felony offender charge because of these former convictions. The trial court noted on the record that this exposure was a major factor, if not the predicate, for the plea. Therefore, the decision to plead was a complex one; to

The upholding of the defendant's conviction by the failure to grant certification from the summary affirmance of the defendant's conviction by the Appellate Court[11] is evidence that this court ascribes no practical relevance to the defendant's mental capacity and its effect on the voluntariness of his plea. Today we add Gregory Blue's name to the growing list of defendants who have been subjected to the harsh procedural and substantive rules regarding criminal culpability that are employed by this court. *State* v. *Patterson,* 229 Conn. 328, 641 A.2d 123 (1994); *State* v. *Medina,* 228 Conn. 281, 636 A.2d 351 (1994); *State* v. *Joyner,* 225 Conn. 450, 625 A.2d 791 (1993); *State* v. *Raguseo,* 225 Conn. 114, 622 A.2d 519 (1993); *State* v. *Stanley,* 223 Conn. 674, 613 A.2d 788 (1992). These cases fail to honor this state's proud history of trying and punishing only those individuals who are competent at the time of the commission of the crime, at the time of the trial, and at the time of punishment itself. See *State* v. *Joyner,* supra, 487–92 (*Berdon, J.,* dissenting); id., 489 ("Five short years after the adoption of the constitution of 1818, Justice Swift wrote: '[I]t is the reason of man that makes him accountable for his actions, and where there is no reason there is no crime . . . .' 2 Z. Swift, A Digest of the Laws of the State of Connecticut [1823] p. 361 . . . .").

Justice Blackmun recently wrote with regard to the upholding of a death sentence predicated on the defendant's guilty plea and refusal to put on mitigating evidence at the capital sentencing hearing: "To try, convict, and punish one . . . helpless to defend himself contravenes fundamental principles of fairness and

---

uphold this "choice" under circumstances indicating a high probability that the defendant was mentally ill and heavily medicated at the time is particularly unjust.

[11] The entire opinion of the Appellate Court reads as follows: "The judgment is affirmed." *State* v. *Blue,* 33 Conn. App. 941, 942, 638 A.2d 1098 (1994).

impugns the integrity of our criminal justice system. I cannot condone the decision to accept, without further inquiry, the . . . 'choice' of a person who was so deeply medicated and who might well have been severely mentally ill." *Godinez* v. *Moran,* U.S. , 113 S. Ct. 2680, 2696, 125 L. Ed. 2d 321 (1993) (Blackmun, J., dissenting). Neither could I, and accordingly I would grant the defendant's petition for certification.