## MAUREEN MURPHY *v.* LORD
## THOMPSON MANOR, INC.
## (AC 28106)

Flynn, C. J., and Lavery and West, Js.

Argued November 28, 2007—officially released January 29, 2008

*Julie D. Blake*, for the appellant (defendant).

*Lindy R. Urso*, with whom, on the brief, was *David C. Erdos*, for the appellee (plaintiff).

*Opinion*

FLYNN, C. J. We are born, some marry and we die. In this list of life events, it is only in marriage that we make choices. This appeal arises out of an action by the plaintiff, Maureen Murphy, to recover damages from the defendant, Lord Thompson Manor, Inc. (manor), for its failure to perform a contract for wedding related services and accommodations. Following a trial to the court, the court found the manor liable under theories of breach of contract and negligent infliction of emotional distress and awarded the plaintiff $17,000 in economic and noneconomic damages, plus costs. On appeal, the manor claims (1) that there was insufficient evidence to support the trial court's finding that (a) its conduct created an unreasonable risk of causing emotional distress to the plaintiff and (b) any distress suffered by the plaintiff was foreseeable in light of an e-mail sent by the manor's agent, but not received by the plaintiff, and (2) that the noneconomic damages awarded are excessive. We affirm the judgment of the trial court.

The court made the following findings of fact. In early 2003, the plaintiff became engaged to her now husband, Jason Martin. Shortly thereafter, she became aware of the manor though a television program devoted to weddings. The program depicted the manor as a large estate featuring outdoor grounds suitable for holding a wedding ceremony, lodging for guests and a banquet hall with fireplaces. The plaintiff considered the manor her ideal wedding site, as it could accommodate a "weekend celebration" consisting of a Friday night rehearsal dinner, a Saturday evening wedding reception and after party, and a Sunday brunch.

On February 21, 2003, the plaintiff and her mother, Sandra Powers, visited the manor and met with its owner and agent, Andrew Silverston. Silverston gave the plaintiff the manor's standard letter of agreement, which stated in pertinent part: "The following serves as a letter of agreement between the Murphy/Martin Wedding party and the Lord Thompson Manor in Thompson, Connecticut. All arrangements are being held on a tentative basis and require your signature on the enclosed copy before commitment can be finalized. . . . If the Murphy/Martin Wedding party should cancel, the Lord Thompson Manor will retain the deposit as a cancellation penalty. . . . Upon receipt of the signed copy and deposit, your date will be held on a definitive basis." As a result of the meeting, the plaintiff signed the letter, and Powers submitted $2000 in deposit money on behalf of the plaintiff, thus fulfilling each condition the letter requested for finality. The letter further identified the date of the wedding as September 10, 2005.

In the two years following the signing of the contract, a Shakespearean drama of confusion and lost opportunities ensued that would result in the manor contracting with another wedding party for the September 10, 2005 date and the plaintiff holding her wedding at another location. This outcome was brought about by a series of miscommunications leading to Silverston's mistaken belief that the plaintiff was abandoning her wedding plans. To begin, in August, 2003, the plaintiff e-mailed the manor, requesting a copy of the signed agreement because she could not find her copy. There is no evidence of a response from the manor. In January, 2004, the manor sent a letter to the plaintiff requesting a deposit to hold the September 10, 2005 date for the wedding, despite the fact that it had received and deposited the check ten months earlier. There is no evidence of a reply from the plaintiff. At approximately the same time, the plaintiff changed her e-mail address but failed

to inform the manor of her updated information. Later, in January, 2005, Silverston's wife e-mailed the plaintiff to set up a date for a food tasting in order to determine the entree selection at the wedding reception.[1]

Shortly thereafter, in February, 2005, Silverston became uncertain about whether the plaintiff's wedding was going forward. His insecurities were caused by his continued mistaken belief that there was no signed agreement or paid deposit. At the same time, Silverston had an inquiry from another couple who wanted to be married on September 10, 2005. He advised them that he might have a cancellation. On February 8, 2005, Silverston sent the plaintiff an express mail letter, asking her to contact him. The letter, however, contained no notice that the manor was uncertain of her wedding plans. It did not mention the alleged lack of a deposit, the misplacement of the signed letter of agreement or the interest of a second wedding party.

Silverston believed that his suspicions that the plaintiff's wedding was cancelled were confirmed by the lack of an immediate response from the plaintiff, as it was his experience that brides were anxious by nature and responded promptly to inquiries from their wedding coordinator. A little more than one week later, on February 17, 2005, Powers called Silverston regarding the letter. Silverston was shocked to receive Powers' call and testified that he thought he was hearing from a "ghost." He did not explain the situation to Powers but instead told her that he was busy and would call her back shortly. Silverston's reluctance to speak with Powers was caused by the fact that the day before she called, he orally had promised the manor to the larger wedding party for the September 10, 2005 date. At that point, Silverston had not signed a contract with that

[1] The record does not reveal which e-mail address Silverston's wife used to contact the plaintiff.

second wedding party. The plaintiff called Silverston on February 22, 2005, but Silverston did not take the call.

During the six days following Powers' call, Silverston took no action to rectify the situation. Finally, on February 23, 2005, Silverston sent a letter to the plaintiff in which he inaccurately portrayed the February 21, 2003 letter agreement as tentative. Silverston's depiction of the parties' agreement as tentative was in direct contradiction of the agreement's language: "Upon receipt of the signed copy and deposit, your date will be held on a definitive basis," when the manor was in possession of both the signed agreement and the deposit. He further indicated in the letter that because the plaintiff and Powers had taken slightly more than one week to respond to his February 8, 2005 letter, he assumed that they were no longer interested in reserving the date of September 10, 2005.[2]

The receipt of Silverston's letter stunned the heretofore unaware plaintiff. On February 24, 2005, she sent the manor an e-mail detailing her communications with the staff at the manor, denied receiving calls from Silverston and asked that he call her back immediately. Using the plaintiff's correct e-mail address, on February 25, 2005, Silverston attempted to resolve the problem by offering the plaintiff an alternate date and a decrease in the contract price. On February 26, 2005, the plaintiff responded and rejected the alternate date, adding that "[we] have been planning for two [years it] seems more appropriate to offer this to clients who have only a week's worth of planning done." Silverston responded to the plaintiff's e-mail but used her old e-mail address. As a result, the plaintiff did not hear a response from

---

[2] The letter stated as follows: "We found your lack of response to be highly unusual and we gave the date to another wedding party on 2/16/05 . . . . So I am not sure where this leaves us, the date of 9/10/05 is no longer available. If you're still interested in a date with us we will be happy to do this on another available day."

the manor until March 8, 2005. Meanwhile, on March 4, 2005, Silverston e-mailed the second bride and asked her to consider switching the date of her wedding. He offered her financial incentives and described the plaintiff as "hysterical." The March 8, 2005 e-mail to the plaintiff, however, did not advise her that she could go forward with her wedding plans. It instead indicated that "the issue of the date" was not resolved and asked that the plaintiff call the manor. There were no further significant conversations between the parties.

During this period, the plaintiff's anxiety about her wedding plans increased, and feelings of extreme distrust for the manor developed. Because of her uncertainty that the manor would honor its contractual obligations, the plaintiff feverishly attempted to locate a venue that would accommodate her September 10, 2005 wedding date. After calling numerous sites, the plaintiff was able to find one venue with availability, but she had to hold the wedding in the morning and the reception could last only until 4 o'clock in the afternoon. The wedding that took place on that date was a far cry from the weekend celebration the plaintiff originally had planned. The plaintiff testified that these events were the most stressful in her life. Powers described her daughter as devastated.

On March 21, 2005, the plaintiff filed a seven count complaint alleging breach of contract, Connecticut Unfair Trade Practices Act violations, negligent and intentional infliction of emotional distress, theft, unjust enrichment and fraud. Following a trial to the court, in a memorandum of decision filed September 21, 2006, the court, *Cosgrove, J.*, awarded the plaintiff $2000 in economic damages for breach of contract and $15,000 in compensatory damages for negligent infliction of emotional distress. The court ruled in favor of the defendant on all remaining claims. This appeal followed, in which the manor challenges the judgment only as to

the negligent infliction of emotional distress claim and the corresponding damages award.

## I

The manor first claims that the evidence was insufficient to support the court's finding of negligent infliction of emotional distress. We begin by setting forth the standard of review. "[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we will give the evidence the most favorable reasonable construction in support of the verdict to which it is entitled. . . . A factual finding may be rejected by this court only if it is clearly erroneous." (Internal quotation marks omitted.) *Barbara Weisman, Trustee* v. *Kaspar*, 233 Conn. 531, 541, 661 A.2d 530 (1995).

To establish a claim of negligent infliction of emotional distress, a plaintiff must prove the following elements: "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 444, 815 A.2d 119 (2003). Our Supreme Court "continually [has] held that in order to prevail on a claim of negligent infliction of emotional distress, the plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might

result in illness or bodily harm." (Internal quotation marks omitted.) Id., 446.

Further, it has reasoned that a successful claim of negligent infliction of emotional distress "essentially requires that the fear or distress experienced by the plaintiffs be reasonable in light of the conduct of the defendants. If such a fear were reasonable in light of the defendants' conduct, the defendants should have realized that their conduct created an unreasonable risk of causing distress, and they, therefore, properly would be held liable. Conversely, if the fear were unreasonable in light of the defendants' conduct, the defendants would not have recognized that their conduct could cause this distress and, therefore, they would not be liable." (Internal quotation marks omitted.) Id., 447; see also *Scanlon* v. *Connecticut Light & Power Co.*, 258 Conn. 436, 446, 782 A.2d 87 (2001); *Barrett* v. *Danbury Hospital*, 232 Conn. 242, 261–62, 654 A.2d 748 (1995).

A

The manor claims that pursuant to *Carrol*, its actions did not create an unreasonable risk of causing emotional distress to the plaintiff. The essence of the manor's argument is that the law requires a finding that its conduct was unreasonable, outrageous or egregious and that the court made no such finding.[3] We disagree with the manor's recitation of the law.

The manor relies on the following language from *Perodeau* v. *Hartford*, 259 Conn. 729, 755, 792 A.2d

[3] The manor also argues that its claim should be reviewed de novo because the defendant's negligent conduct does not form the basis for emotional distress liability absent a manifestation of physical injury. Our Supreme Court repeatedly has stated that "there is no logical reason for making a distinction, for purposes of determining liability, between those cases where the emotional distress results in bodily injury and those cases where there is emotional distress only. . . . The only requirement is that the distress *might* result in illness or bodily harm." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Carrol* v. *Allstate Ins. Co.*, supra, 262 Conn. 448.

752 (2002), in crafting its argument: "Implicit in [the conclusion that a termination of employment may give rise to a claim for negligent infliction of emotional distress if the conduct under review involved an unreasonable risk of emotional distress that might result in illness or bodily harm] is a recognition that emotional distress that might result in illness or bodily harm is a foreseeable consequence of particularly egregious conduct involving a termination [of employment], which would, in turn, give rise to a duty to avoid such conduct." The manor mistakenly interprets this language as adding a requirement that the conduct in question must be unreasonable, egregious or outrageous in the context of this case. The contractual relationship in this case, however, is distinguishable from the employment relationship discussed in *Perodeau*. See id., 758–59 (discussing merits of negligent infliction of emotional distress claim arising out of ongoing employment relationship). A contract for wedding services creates a rigorous expectation for contractual performance. An employee at will, on the other hand, has no contract, may be terminated at will and, therefore, operates under the assumption that he or she may be terminated at any time without cause. Thus, only if the manner of termination of an at will employee is unreasonable, outrageous or egregious will the tort of negligent infliction of emotional distress lie in such context. The plaintiff's contract for services was not limited by any similar assumptions. On the contrary, she had every reason to believe that the manor would perform its role according to the binding contract concerning arrangements for this important life event.

Furthermore, the facts of this case are comparable to the more recent *Carrol* case rather than to *Perodeau*. In *Carrol*, the trial court awarded the plaintiff compensatory damages arising out of the defendant's negligent infliction of emotional distress. *Carrol* v. *Allstate Ins.*

*Co.*, supra, 262 Conn. 435. On appeal, our Supreme Court affirmed the trial court's finding that the defendant insurer wrongly had withheld benefits following its erroneous determination that an accidental house fire was caused by the plaintiff's commission of arson. Id., 444–46. In reaching its conclusion, the Supreme Court articulated no further requirement that the conduct in question be unreasonable, egregious or outrageous, but rather analyzed the case pursuant to the four-pronged test already cited. Specifically, after reviewing the evidence, the court concluded that "there was sufficient evidence to support a finding that the defendant's conduct created an unreasonable risk of causing the plaintiff's emotional distress and that the plaintiff's distress was foreseeable." Id., 447–48.

Likewise here, we agree with the trial court that the actions of the manor's agent, Silverston, "created an unreasonable risk of causing [the plaintiff] emotional distress." The court noted in particular that "the manor gave [the plaintiff] no notice that it had questions about her wedding plans. The first direct notice she received of the manor's concerns was the manor's cancellation letter of February 23, 2005. [Although] the Manor's breach occurred approximately seven months before [the plaintiff's] wedding was to take place, it left her with limited options for alternative venues and the significant task of coordinating the details in light of a different venue and a different wedding day schedule, as well as informing 100 guests of the changes. . . . In addition, the Manor informed [the plaintiff] that it had given her date to another couple on February 16, 2005, when in fact it did not have a contract with the second party until March 6, 2005." These findings are supported by a review of the record and testimony of the parties. Because the cumulative effect of the conduct described by the court undoubtedly would risk causing any bride

emotional distress, we conclude that the findings of the court were not clearly erroneous.

## B

The manor next claims that any distress suffered by the plaintiff was not foreseeable in light of the February 27, 2005 e-mail sent by Silverston but not received by the plaintiff. In that e-mail, Silverston stated that "[we] will get back to you next week on the date after we talk with the other party." We agree with the plaintiff that by the time this e-mail had been sent, the manor's conduct already had caused foreseeable distress to the plaintiff.

A wedding generally is considered one of the most important days in one's life. It also is widely known that such a ceremonious event requires extensive planning and preparation. As the court stated in its memorandum of decision: "The manor is in the business of hosting weddings and receptions. It is in a position to see how clients react to a myriad of wedding related mishaps. . . . The cancelling of an event that [the plaintiff] had been planning for two years would naturally and foreseeably cause her distress, particularly given the difficulty of moving the multiday festivities (Friday night dinner through Sunday brunch) to another venue with only seven months' notice." The cancellation to which the court refers is Silverston's February 23, 2005 letter in which he stated that "[we] found your lack of response to be highly unusual and we gave the [September 10, 2005] date to another wedding party on February 16, 2005." We agree with the court that the issuance of February 23, 2005 letter foreseeably would cause the plaintiff distress. Accordingly, because the manor already had engaged in such conduct before the composition of the February 27, 2005 e-mail, its argument that it could not have foreseen any distress on the plaintiff's part is without merit. We, therefore,

conclude that the finding of the court that the plaintiff's distress was foreseeable was not clearly erroneous.

## II

The manor also claims that the award of $15,000 in compensatory damages was excessive in comparison to the $2000 awarded in economic damages. The plaintiff argues in response that the damages awarded were fair and reasonable. We agree with the plaintiff.

We begin by setting forth the appropriate standard of review. "[T]he trial court has broad discretion in determining whether damages are appropriate. . . . Its decision will not be disturbed on appeal absent a clear abuse of discretion." (Internal quotation marks omitted.) *Barber* v. *Mulrooney*, 61 Conn. App. 108, 111, 762 A.2d 520 (2000). "The assessment of damages is peculiarly within the province of the trier and the award will be sustained so long as it does not shock the sense of justice. The test is whether the amount of damages awarded falls within the necessarily uncertain limits of fair and just damages. . . . We are aware that we cannot disturb the decision of the trial court unless there are considerations of the most persuasive character." (Citations omitted; internal quotation marks omitted.) *Buckman* v. *People Express, Inc.*, 205 Conn. 166, 174–75, 530 A.2d 596 (1987).[4]

---

[4] We note that the manor also has claimed that we should review the award de novo in order to determine if the damages are compensatory rather than punitive in nature. Because the manor has failed to cite any relevant case law or other legal authority in support of its position, we decline to review this claim on the ground that it has been briefed inadequately. See *Wren* v. *MacPherson Interiors, Inc.*, 69 Conn. App. 349, 359, 794 A.2d 1043 (2002).

We further note that both parties state in their briefs that an award of damages is reviewed under the clearly erroneous standard. Although this standard may be relevant in a review of the calculation of damages in a breach of contract action; see, e.g., *Duplissie* v. *Devino*, 96 Conn. App. 673, 699, 902 A.2d 30, cert. denied, 280 Conn. 916, 908 A.2d 536 (2006); it is not the appropriate standard of review for an award of compensatory damages. See, e.g., *Smith* v. *Snyder*, 267 Conn. 456, 465–66, 839 A.2d 589 (2004).

With this deferential standard in mind, we cannot conclude that the compensatory damages award was excessive. In reaching an appropriate award, the court carefully "considered the testimony of the plaintiff and her mother as it relates to [the plaintiff's] emotional and physical state [in addition to] the conduct and the explanations offered by the defendant." Our review of the record leads us to the conclusion that the court's award neither shocks the senses nor falls outside the uncertain limits of fair and just damages. Accordingly, we conclude that the court did not abuse its discretion in awarding the plaintiff $15,000 in compensatory damages.

The judgment is affirmed.

In this opinion the other judges concurred.