******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MADELEINE GLEASON ET AL. *v.*
JANICE SMOLINSKI ET AL.
(AC 34990)

Alvord, Bear and Sheldon, Js.

*Argued November 20, 2013—officially released April 8, 2014*

(Appeal from Superior Court, judicial district of New Haven, Wilson, J. [motions to strike, summary judgment; judgment]; Hon. Thomas J. Corradino, judge trial referee [judgment].)

*Steven J. Kelly*, pro hac vice, with whom were *Anne T. McKenna*, pro hac vice, and *Christopher DeMarco*, for the appellants (named defendant et al.).

*John R. Williams*, for the appellee (named plaintiff).

*Opinion*

SHELDON, J. The defendants Janice Smolinski and Paula Bell[1] appeal from the trial court's judgment in favor of the plaintiff Madeleine Gleason[2] on her claims of intentional infliction of emotional distress and defamation arising from the defendants' conduct following the disappearance in 2004 of Bill Smolinski, who is Janice Smolinski's son and Bell's brother. The defendants make six arguments as to why the judgment of the court should be reversed: (1) the court erred in failing to bar the plaintiff's claims under the first amendment to the United States constitution; (2) the trial judge exhibited bias and partiality that constituted plain error; (3) the court erred in relying on hearsay statements to determine that the defendants intended to inflict emotional distress upon the plaintiff; (4) there was insufficient evidence to support the finding of intentional infliction of emotional distress; (5) there was insufficient evidence to support the finding of defamation; and (6) the court erred in awarding compensatory and punitive damages to the plaintiff. For the following reasons, we disagree with the defendants and affirm the judgment of the court.

The following facts and procedural history, as set forth by the trial court in its memorandum of decision filed August 10, 2012, are relevant to our resolution of the foregoing claims. "The plaintiff Madeleine Gleason is and was at the time of the events central to this case a school bus driver. For a time, the young man whose disappearance has never been explained worked at the same company. They met there and [the plaintiff] began dating the young man whom the court will refer to as Bill Smolinski.[3] Both of his parents and sister constantly referred to him as 'Billy,' which, for the court, at least underlines the affection in which he was held as [the] only son to Mr. William Smolinski and Janice Smolinski, the parents; and the only brother to Paula Bell. Janice Smolinski and Paula Bell are the defendants in the case, which was initiated by [the plaintiff] almost two years after the disappearance of Bill Smolinski. . . .

"[S]hortly after the disappearance of their son on August 24, 2004, Mr. and Mrs. Smolinski and their daughter Paula Bell, started putting up missing persons posters[4] in various parts of the state. They then noticed some of the posters were being torn down or vandalized and discovered the plaintiff and a friend were engaged in this activity. The two defendants . . . then proceeded to follow [the plaintiff] and videotaped her activities in this regard. [The plaintiff] claims the posters were placed along her school bus route and generally where she lived, worked, and conducted some of her life activities. Eventually some of these activities led to the plaintiff going to the Woodbridge police station, where the defendants soon followed. A confrontation took place between the parties.

"[The plaintiff] claims the defendants' activities interfered with and damaged her monetarily by interfering with her business of operating a school bus for a living. She also says she was defamed by the defendants who had characterized her as a murderer. She also states that her right to privacy was invaded and that generally the defendants intentionally inflicted great emotional stress on her, causing her much anxiety and torment.

"The defendants countered the allegations by saying [that the] alleged actions critical of them were, generally speaking, all lies. They deny entering a bus which [the plaintiff] was driving or going on school property to post a missing persons poster at a school where [the plaintiff] brought and dropped off students. They deny calling [the plaintiff] a murderer or harassing her on the phone. The plaintiff and the defendants trade mutual accusations about being followed by their respective antagonists."

The court found that the defendants' conduct constituted intentional infliction of emotional distress and that their statements that the plaintiff was a murderer or was involved in murder constituted defamation. The court awarded the plaintiff compensatory damages of $32,000 on her claim of intentional infliction of emotional distress and $7500 on her claim of defamation, for a total compensatory damages award of $39,500. The court also awarded the plaintiff punitive damages on both claims in an amount equal to one-third of the plaintiff's total compensatory damages award (i.e., one third of $39,500, or $13,166.67). This appeal followed. Additional facts will be set forth as necessary. We will address each of the defendants' claims separately.

I

FIRST AMENDMENT CLAIM

We turn first to the defendants' argument that the plaintiff's claims are barred by the first amendment to the United States constitution, which was not preserved by the defendants at trial. The defendants argue that their unpreserved claim nonetheless is properly before this court because the requirements of *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), have been satisfied. We disagree.

In *Golding*, our Supreme Court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will

fail." (Emphasis in original; footnote omitted.) Id., 239–40. We conclude that the record is adequate for review and that the defendants' claim is of constitutional magnitude because it alleges a violation of the fundamental right to free speech under the first amendment to the United States constitution.[5] Thus, we turn our attention to the third prong of *Golding*, namely, whether the alleged constitutional violation clearly exists and clearly deprived the defendants of a fair trial.

In support of their argument that a constitutional violation clearly exists, the defendants claim that their conduct constituted protected speech and that the court should have dismissed the plaintiff's claims against them as barred by the first amendment. The defendants assert that their speech related to a matter of public concern because the missing person posters were designed to uncover information about Bill Smolinski's disappearance, and to assist with the ongoing investigation and potential prosecution of a crime. The defendants cite to *Snyder* v. *Phelps*, U.S. , 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011), in support of this assertion. Such comparison to the public speech described in *Snyder*, however, is unconvincing.

"The Free Speech Clause of the First Amendment . . . can serve as a defense in state tort suits, including suits for intentional infliction of emotional distress." Id., 1215. Whether the first amendment prohibits holding the defendants liable for their speech in this case "turns largely on whether that speech is of public or private concern, as determined by all the circumstances of the case. [S]peech on matters of public concern . . . is at the heart of the First Amendment's protection. . . . The First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open. . . . That is because speech concerning public affairs is more than self-expression; it is the essence of self-government. . . . Accordingly, speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection. . . .

"[N]ot all speech is of equal First Amendment importance, however, and where matters of purely private significance are at issue, First Amendment protections are often less rigorous. . . . That is because restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest: [T]here is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas; and the threat of liability does not pose the risk of a reaction of self-censorship on matters of public import." (Citations omitted; internal quotation marks omitted.) Id., 1215–16.

"Speech deals with matters of public concern when

it can be fairly considered as relating to any matter of political, social, or other concern to the community . . . or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public. . . . The arguably inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern. . . .

"Deciding whether speech is of public or private concern requires us to examine the content, form, and context of that speech, as revealed by the whole record. . . . [T]he court is obligated to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression. . . . In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." (Citations omitted; internal quotation marks omitted.) Id., 1216.

In *Snyder*, members of the defendant church congregation stood on a plot of public land about 1000 feet from a church and picketed the military funeral for the plaintiff's son by holding signs reflecting the defendant's views about homosexuality and the death of soldiers. Id., 1213. The United States Supreme Court described the defendant's speech as follows: "The content of [the defendant]'s signs plainly relates to broad issues of interest to society at large, rather than matters of purely private concern. . . . The placards read 'God Hates the USA/Thank God for 9/11,' 'America is Doomed,' 'Don't Pray for the USA,' 'Thank God for IEDs,' 'Fag Troops,' 'Semper Fi Fags,' 'God Hates Fags,' 'Maryland Taliban,' 'Fags Doom Nations,' 'Not Blessed Just Cursed,' 'Thank God for Dead Soldiers,' 'Pope in Hell,' 'Priests Rape Boys,' 'You're Going to Hell,' and 'God Hates You.' . . . While these messages may fall short of refined social or political commentary, the issues they highlight—the political and moral conduct of the United States and its citizens, the fate of our Nation, homosexuality in the military, and scandals involving the Catholic clergy—are matters of public import. The signs certainly convey [the defendant]'s position on those issues, in a manner designed . . . *to reach as broad a public audience as possible.* And even if a few of the signs— such as 'You're Going to Hell' and 'God Hates You'— were viewed as containing messages related to [the plaintiff] or [the plaintiff's family] specifically, that would not change the fact that the overall thrust and dominant theme of [the] demonstration spoke to broader public issues." (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 1216–17.

The defendants argue that their challenged speech pertaining to the search for information to assist with a missing person investigation and potential prosecu-

tion of a crime relates to a matter of public concern, and thus is protected by the first amendment. They argue that their speech related to a matter of public concern because all of the posters were located on public grounds and none of the posters mentioned the plaintiff by name. Insisting that their conduct constituted constitutionally protected speech, they argue that the court erred by rendering a judgment of liability against them. The plaintiff argues that the defendants' conduct did not constitute speech, nor did it address a matter of public concern. The plaintiff asserts that, unlike in *Snyder*, the defendants' conduct in posting and displaying the challenged posters was not designed or intended to communicate about a matter of public concern to a broad public audience, but rather to target, harass and upset the plaintiff personally in order to "break her." Having heard testimony that the defendants targeted the plaintiff by placing large quantities of posters near where the plaintiff was residing at the time, the court agreed with the plaintiff and found that: "[The plaintiff] lived with [her friend, Melissa DePallo] for a short time . . . on a dead-end street, and her house was definitely bombarded with flyers. There were no other flyers on the whole street; the pole in front of her house had twenty posters placed on it. When they were taken down, they went up the next day; it went on not just for the few months [that the plaintiff] lived with DePallo, it went on for a year according to her. [The plaintiff] testified that she lived with another friend, who testified on her behalf, and that person's house was saturated with posters. . . . [The plaintiff] also testified that when she returned to her own home in Woodbridge, it, too, was saturated with posters— the same pattern repeated itself at all three places where she lived. The posters would go up, they would be taken down and then appear the next day. [The plaintiff] also testified that the defendants followed her and [that] whenever they saw her called her insulting names. . . . This evidence leads the court to credit the testimony of the plaintiff [and] her friends . . . ." (Internal quotation marks omitted.)

The court's findings of fact support its conclusion that the defendants' placement of many of the posters was targeted specifically at the plaintiff, for the defendants' admitted purpose of "trying to break [the plaintiff] . . . until [she] breaks down and gives them information as to the whereabouts of their son and brother who had been missing since August 24, 2004." The court credited the evidence and testimony presented by the plaintiff and her witnesses, and found that the defendants' conduct was "extreme and offensive . . . [and] cannot be accepted in a society built on law." The defendants argue that the context of the speech and its connection to the plaintiff do not make the subject of the speech any less about a matter of public concern. While the content of the posters makes

no specific reference to the plaintiff, the court concluded, and we agree, that the context and placement of the posters was designed to "hound" the plaintiff into providing the defendants with information about the disappearance of Bill Smolinski, rather than to raise a matter of public concern.

Because the defendants' conduct, insofar as it targeted the plaintiff, is not protected speech, their claim of a constitutional violation resulting in the deprivation of a fair trial fails to satisfy the third prong of *Golding*.

## II

### JUDICIAL BIAS CLAIM

The defendants next claim that the judge exhibited bias by: (1) publicly committing himself, on the record during trial, to the defendants' liability and wrongdoing; (2) admitting and relying upon hearsay evidence proffered by the plaintiff; (3) holding in-chambers hearings to protect the reputation of a local politician and witness Christian Sorensen; and (4) refusing to permit the defendants' repeated offers of evidence as to the defense of truth, motive and witness credibility. The defendants argue that this court's failure to reverse the judgment because of these alleged instances of judicial bias would result in manifest injustice. We disagree.

The plaintiff asserts that the defendants' claims must fail because they did not file a motion for disqualification pursuant to Practice Book §§ 1-22 and 1-23. Ordinarily, a "defendant's claim of judicial bias must fail because he did not file a motion for disqualification in the trial court. We have repeatedly refused to consider claims of trial court bias in the absence of such a motion. . . . The fact that a trial court rules adversely to a litigant, even if some of these rulings were to be determined on appeal to have been erroneous, does not demonstrate personal bias." (Citations omitted.) *Bieluch* v. *Bieluch*, 199 Conn. 550, 552–53, 509 A.2d 8 (1986). This court may, however, when presented "with an accusation of prejudice against a judge, which strikes at the very core of judicial integrity and tends to undermine public confidence in the established judiciary . . . invoke [its] authority in the interests of justice to review plain error not properly preserved in the trial court." (Citation omitted; internal quotation marks omitted.) *Cameron* v. *Cameron*, 187 Conn. 163, 168, 444 A.2d 915 (1982).

"No more elementary statement concerning the judiciary can be made than that the conduct of the trial judge must be characterized by the highest degree of impartiality. If he departs from this standard, he casts serious reflection upon the system of which he is a part. . . . In whatever he does, however, the trial judge should be cautious and circumspect in his language and conduct. . . . A judge should be scrupulous to refrain from hearing matters which he feels he cannot approach

in the utmost spirit of fairness and to avoid the appearance of prejudice as regards either the parties or the issues before him. . . . A judge, trying the cause without a jury, should be careful to refrain from any statement or attitude which would tend to deny the defendant a fair trial. . . . It is his responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding." (Citations omitted; internal quotation marks omitted.) Id., 168–69.

It is evident when reviewing the record before us that no such departure occurred in the trial court. The defendants specifically claim that the following statement made by the judge demonstrates judicial bias because he publicly committed himself to the conclusion that the defendants inflicted trauma on the plaintiff, causing her damage: "[T]he fact that it—that it follows her wherever she goes and whatever she does, just like they followed her wherever she went and whatever she did, that's part of what's happened to this woman, and it's part of the trauma that they've inflicted upon her." The defendants argue that this statement reflects that the judge, prior to the conclusion of the presentation of all of the evidence, credited the plaintiff's testimony over that of the defendants and their witnesses, and constitutes judicial bias.

When this statement is viewed in the proper context, however, it is apparent that this statement was not made by the court, but rather, was made by the plaintiff's counsel. The context of the allegedly biased statement, which occurred during the direct examination of the plaintiff by her counsel, is as follows:

"Q. Now, what, if any, reaction did you have to all of these things that were being done to you?

"A. Well—well, I thought it was over with in the beginning, but every three months to maybe every four and five months my name was in the paper and how my children died, every single time. Every single time I had to read how my daughter died and how my son died. And when I called the Waterbury Police Department about my son's death, all they were concerned with was Billy Smolinski; they didn't even give a darn about my son's death. All I read in the paper is Madeleine Gleason, how many times I was married and how many children died; what did that have to do with their son missing? My children—my daughter died before he went missing, and two of my children died after he went missing; of all people, I would know what it's like to lose a child, but these people all they do is keep following me, harassing me. Every time I turn on the news, it's Madeleine Gleason, what does she have to hide? And if you watch on the show, The Disappearance, my name seventy times on the show. And all these newspapers and these television shows are going by what the Smolinskis are telling them; they've never

come to me and asked me what my story is. I never even knew I was going to be on television until I watched it. All these things that they say, it's a love triangle. The reason why Bill and I broke up, and they know this, is because I was older than him, and I could not handle the age difference. That's the reason, it has nothing to do with the other man. The other man and I had broken up months before Billy and I even started seeing each other.

"Q. Now, how—how did these feelings that you had affect your daily life?

"A. They affected everything. My daughter died, she has a daughter, I went to go get custody of my granddaughter, their lawyer used the Smolinski case for me not to get my granddaughter. Then they—then they said for me to go to counseling because there's no way that I could have my granddaughter. It took me—I'm up to seven years fighting for custody of my granddaughter, and it always brings up the Smolinski case, that the reason why—it's questionable whether I did any killing or not.

"[The Defendants' Counsel]: Your Honor, I just want to put in the air that the custody disposition, whatever it may or may not be, is just not relevant.

"[The Plaintiff's Counsel]: It's clearly part of the collateral consequences.

"[The Defendants' Counsel]: It's a completely different tribunal, completely different setting; who knows what facts they're looking at.

"[The Plaintiff's Counsel]: You set in motion a chain of events, and you're responsible for the consequences.

"[The Defendants' Counsel]: If I may finish my objection that she's supposing the basis for it.

"The Court: I mean—I mean, do I take judicial notice of what some other court did regarding custody?

"[The Plaintiff's Counsel]: No, I'm not asking that, your Honor.

"The Court: I can't. Well, I can't go there.

"[The Plaintiff's Counsel]: What I'm asking you to take note of is her testimony that the subject was brought up during that hearing, too, that she can't get away from what these people have done.

"The Court: Yeah, But I can't deduce—

"[The Plaintiff's Counsel]: I'm not asking—

"The Court:—what—the reason she didn't get the granddaughter.

"The Court [The Plaintiff's Counsel]: Absolutely not. I'm not asking you to. But the fact that it—that it follows her wherever she goes and whatever she does, just like they followed her wherever she went and whatever she

did, that's part of what's happened to this woman, and it's part of the trauma that they've inflicted upon her.

"[The Plaintiff]: Plus, the kids on my bus—

"The Court: Okay. There's no question pending. I—I'm not going to deduce from that that because of—she's just saying at a separate hearing—there could be a hearing—I don't want—this is a very stressful case, but it could be a hearing in front of a—so, I don't mean to belittle what's going on, it could be a hearing in front of the zoning board where this is mentioned, so, *I don't attach any importance to she's not getting her granddaughter because of anything these people allegedly did.*" (Emphasis added.)

Although the transcript notes that this statement was made by the court, common sense and context compel the conclusion that the actual speaker of this statement was the plaintiff's counsel, as evidenced by the speaker's explanation in support of the introduction of the plaintiff's testimony about a custody hearing, the outcome of which the plaintiff relates to the defendants' alleged conduct.[6] Further, the speaker of the statement immediately preceding the statement in question was the court, which also supports the conclusion that the identification of the court as the speaker of the statement in question appears to be a scrivener's error.

The *actual* statement made by the court during this colloquy in no way demonstrates judicial bias. Rather, the judge remained unbiased and neutral when stating, "I'm not going to deduce from that that because of—she's just saying at a separate hearing—there could be a hearing—I don't want—this is a very stressful case, but it could be a hearing in front of a—so, I don't mean to belittle what's going on, it could be a hearing in front of the zoning board where this is mentioned, so, *I don't attach any importance to she's not getting her granddaughter because of anything these people allegedly did.*" (Emphasis added.) Contrary to the defendants' assertion, the judge did not publicly commit himself to the defendants' liability and wrongdoing prior to the conclusion of the presentation of all of the evidence. In fact, the judge's statement *favors* the defendants because he declares that although the plaintiff testified about the result of the custody hearing, he will not attach any weight to any alleged impact of the defendants' *alleged* conduct on the outcome of that hearing.

The remainder of the defendants' claims asserting judicial bias on the basis of the judge's alleged introduction of allegedly hearsay statements, in-chambers rulings, and refusal to permit evidence as to the defense of truth, motive and witness credibility are equally unsupported by the record and do not constitute judicial bias warranting reversal. The defendants, for instance, claim that it is "astounding that, when the defendants sought to introduce evidence of [the nolle prosequi]

disposition" of Janice Smolinski's arrest for hanging missing person posters, "the court refused to admit it . . . ." (Citation omitted.) The defendants' citation to this portion of the trial transcript reveals, once again, that when viewed in the entire context of the colloquy regarding the evidence of the disposition of that arrest, the defendants misconstrue the judge's ruling in a baseless attempt to support their claim of judicial bias. The judge properly did not permit Woodbridge police Officer James Sullivan to testify on cross-examination about the result of Janice Smolinski's arrest on the ground that such testimony would be hearsay. The defendants completely disregard the fact that the judge, did, however, inform counsel that "[y]ou can get an official record" of the disposition of the arrest. Thus, contrary to the defendants' argument, the judge did not refuse to admit evidence of the disposition of Janice Smolinski's arrest, but rather, he ensured that any such evidence was admitted properly as an official record.

## III

## HEARSAY CLAIM

The defendants next claim that the court erred by relying on alleged hearsay statements to find that the "hanging of posters in areas where the plaintiff lived and worked [was] for the sole purpose of intimidating and harassing the plaintiff." The defendants assert that such a finding was based on (1) Janice Smolinski's alleged statement to police that she was "trying to break" the plaintiff; (2) Smolinski's statements to the Waterbury Observer; (3) and telephone calls to B and B Transportation, Inc., the plaintiff's employer, complaining about the plaintiff. The plaintiff asserts that the court's findings were not based on inadmissible evidence, and that the evidence about which the defendants complain was either introduced by the defendants themselves, or when offered by the plaintiff, was not objected to by the defendants. We agree with the plaintiff.

"We have held generally that [t]he trial court has broad discretion in ruling on the admissibility [and relevancy] of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Additionally, before a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . The harmless error standard in a civil case is whether the improper ruling would likely affect the result." (Citation omitted; internal quotation marks omitted.) *Urich* v. *Fish*, 261 Conn. 575, 580–81, 804 A.2d 795 (2002).

In its memorandum of decision, the court noted that the evidence before it on the plaintiff's claim of intentional infliction of emotional distress "include[d] not

only the trial testimony presented by both sides, but police reports and several articles from the Waterbury Observer, which reported on the disappearance. The defendants did not object to the introduction of these exhibits and in fact introduced Woodbridge and Waterbury Police Department reports, which, in part, repeated some of the information contained in the police reports introduced by the plaintiff." The court advised that "[t]he newspaper articles will only be referred to insofar as they contain explicit admissions by the defendants. Interestingly enough, the transcript indicates that her lawyer asked [Janice] Smolinski if a couple of newspapers introduced into evidence had been read by her. She said she had read them. She was then asked if the articles were 'substantially true and accurate to the best of (her) knowledge'—answer, 'A. Absolutely. Yes.'" The court was justified in relying upon such evidence, which was either introduced or not objected to by the defendants and consisted of damaging admissions by them.

As an example of such evidence, the defendants claim that the judge relied upon hearsay statements contained in Sullivan's police report that Janice Smolinski was hanging the missing person posters in an attempt "to break" the plaintiff into giving her information about her son's disappearance. The defendants claim that they "objected to any testimony by Sullivan regarding what was reported to him based on hearsay, but the court allowed it." The defendants conveniently disregard the fact that after Sullivan testified, the plaintiff's counsel renewed his offer of Sullivan's report as an exhibit, to which the defendants' counsel withdrew his previous objections thereto. The court admitted the police report as a full exhibit, to which the defendants' counsel stated that he "ha[d] no objection." At trial, the defendants' counsel abandoned his objection to the introduction of this evidence, of which he now complains on appeal. Such a claim that the court erred by relying on this evidence is without merit.

IV

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM

The defendants next claim that the court misapplied the law and facts relating to the plaintiff's claim of intentional infliction of emotional distress. Specifically, the defendants assert that the evidence was insufficient to establish the requirements of intentional infliction of emotional distress and that the court erred by ignoring the defendants' justification for their alleged conduct. The defendants claim that the court erred by relying solely on lay testimony to establish that the defendants' conduct was the cause of the plaintiff's distress and that such distress was severe. They argue that where there are alternative theories as to the possible cause of a plaintiff's emotional distress, the plaintiff

must rely on expert testimony to establish causation. They also argue that the court erred by not considering the possibility that there were alternative causes of the plaintiff's emotional distress.[7] We disagree.

"[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we will give the evidence the most favorable reasonable construction in support of the verdict to which it is entitled. . . . A factual finding may be rejected by this court only if it is clearly erroneous." (Internal quotation marks omitted.) *Murphy* v. *Lord Thompson Manor, Inc.*, 105 Conn. App. 546, 552, 938 A.2d 1269, cert. denied, 286 Conn. 914, 945 A.2d 976 (2008).

"In order for the plaintiff to prevail in a case for liability under . . . [intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." (Internal quotation marks omitted.) *Watts* v. *Chittenden*, 301 Conn. 575, 586, 22 A.3d 1214 (2011). The evidence presented supports the court's finding that the defendants' conduct inflicted severe emotional distress on the plaintiff. As the court properly stated, it is not necessary for the plaintiff to produce expert testimony in order to prove the existence of emotional distress. See *Oakes* v. *New England Dairies, Inc.*, 219 Conn. 1, 14–15, 591 A.2d 1261 (1991) ("we have previously rejected the proposition that proof of the existence of emotional distress requires expert testimony" [citations omitted]).

The court concluded, on the basis of the evidence before it, that the defendants engaged in "the hanging of posters in areas where the plaintiff lived and worked for the sole purpose of intimidating and harassing the plaintiff. . . . This went on for months." This conclusion was supported amply by the testimony of the plaintiff's employer, Brad Cohen, her friend, DePallo, and the plaintiff herself. Specifically, the court recounted Cohen's testimony that "in traveling around several towns, the posters were generally 'well spaced out'— at different poles.' However, on [the plaintiff's] school bus run and at the house where she lived, 'there were multiple posters on each and every telephone pole, on guardrails.' He said you could easily do a run (school

bus route) by following the posters—'they led down every street, every side street, every nook and cranny of—of these places.' . . . Cohen also testified that posters were placed at the entrance to his school bus transportation business on either side of the driveway—a driveway the plaintiff would have to enter and exit at least four times daily."

The court also recalled the testimony of DePallo, who works for another school bus company, and who stated that the plaintiff's "[school bus] run was definitely targeted with flyers." For a short time, the plaintiff lived at DePallo's home, about which DePallo testified, is "on a dead-end street, and her house 'was definitely bombarded with flyers.' There were no other flyers on the whole street; the pole in front of her house had twenty posters placed on it. When they were taken down, they went up the next day; it went on not just for the few months [the plaintiff] lived with DePallo, it went on for a year according to her." The court also summarized the plaintiff's testimony "that when she returned to her own home in Woodbridge, it, too, was saturated with posters—the same pattern repeated itself at all three places where she lived. The posters would go up, they would be taken down and then appear the next day. [The plaintiff] also testified that the defendants followed her and [that] whenever they saw her called her insulting names."

When determining whether the defendants' conduct constituted intentional infliction of emotional distress, the court did not consider only the plaintiff's testimony and witnesses, but also the defendants' testimony denying such conduct. Ultimately, the court "credit[ed] the testimony of the plaintiff, her friends, and Mr. Cohen," because although the defendants testified that they did not engage in the conduct of hanging missing person posters in order to harass the plaintiff, "other evidence presented . . . [showed] that the defendants had a strong motive to act in the way it was alleged by the plaintiff." The court's conclusion that the defendants' conduct caused the intentional infliction of emotional distress of the plaintiff is supported by the record and is not clearly erroneous.

The defendants also claim that the court erred by rejecting their justification for their conduct. The defendants assert that their intent was not to harm the plaintiff, but rather to uncover answers concerning Bill Smolinski's disappearance, about which they believed the plaintiff had knowledge. There was, however, "no evidence . . . presented as to why [the defendants] could in fact believe it was a necessary aid to the location of Bill Smolinski to hang posters along [the plaintiff's] bus route." The court carefully balanced the evidence presented and even went so far as to remark that "the [defendants] are to be admired for their persistent efforts to bring Bill Smolinski's disappearance and

their complaints to the highest levels of state government and the federal authorities. One cannot help sympathizing with their pain and frustration." The court added, however, that "what is unacceptable here and worthy of finding of outrageous and extreme behavior is the continuing aggravated nature of the defendants' activity in hounding [the plaintiff] where she lived and worked and engaged in the ordinary activities of life. . . . Posters of a missing person were placed so as to indicate to [the plaintiff] that the very purpose of the poster campaign was to underline her supposed knowledge of the criminal disappearance of Bill Smolinski." (Citation omitted.)

The court's finding that the defendants' conduct was extreme and outrageous and constituted intentional infliction of emotional distress was not clearly erroneous on the basis of the record before it. Thus, we conclude that the court properly held that all of the elements of the plaintiff's claim of intentional infliction of emotional distress were established.

V

DEFAMATION CLAIM

The defendants next claim that the court erred in finding that certain statements made by the defendants regarding the plaintiff constituted defamation. They argue that none of the elements of defamation were established by the evidence presented. We disagree.

As set forth in part IV of this opinion: "[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *Murphy* v. *Lord Thompson Manor, Inc.*, supra, 105 Conn. App. 552.

The court found three statements made by the defendants to be defamatory. Specifically, it found two sets of statements made to the plaintiff's friends, Fran Vrabel and DePallo, to be defamatory: (1) "Janice Smolinski told [Vrabel] on several occasions that [the plaintiff] 'did something to her son' and that 'she believes that either [the plaintiff] or someone in her family murdered her son' "; and (2) "Janice Smolinski approached [DePallo] and said you do not know what [the plaintiff] is capable of; she said she does not believe [the plaintiff] killed her son, personally, but she knows where he is and [Janice] Smolinski thought 'she's involved.' " The court also found the following statement made by the defendants to an unidentified man at the plaintiff's gym to be defamatory: "[The plaintiff] drove to her gym, the defendants were following her, and [the plaintiff] says, 'a guy came and said those people (referring to the Smolinskis) just followed you in and said you were a murderer.' " As to the statements made to Vrabel and

DePallo, the defendants claim that these statements merely represent Janice Smolinski's opinion and therefore, cannot constitute defamation. As to the statement to the man at the plaintiff's gym, the defendants argue that the court erred by admitting the statement because it is hearsay and the identity of the speaker is unclear.

"To establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Cweklinsky* v. *Mobil Chemical Co.*, 267 Conn. 210, 217, 837 A.2d 759 (2004). The plaintiff must also "prove that the defendants acted with actual malice . . . . Actual malice requires that the statement, when made, be made with actual knowledge that it was false or with reckless disregard of whether it was false. . . . A negligent misstatement of fact will not suffice; the evidence must demonstrate a purposeful avoidance of the truth." (Citation omitted; internal quotation marks omitted.) *Chadha* v. *Charlotte Hungerford Hospital*, 97 Conn. App. 527, 537–38, 906 A.2d 14 (2006). Further, as the court explained, "defamations per se are statements charging the plaintiff with commission of a crime. . . . Traditionally, such statements are actionable per se only if they charge the commission of crimes of moral turpitude or infamous penalty . . . . [W]hen the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation." (Citations omitted; internal quotation marks omitted.)

"A defamation claim requires a statement—i.e. an assertion of fact, either explicit or implied, and not merely an opinion, provided the opinion does not imply the existence of undisclosed defamatory facts." *Lester* v. *Powers*, 596 A.2d 65, 69 (Me. 1991) "To be actionable, the statement in question must convey an objective fact, as generally, a defendant cannot be held liable for expressing a mere opinion." *Daley* v. *Aetna Life & Casualty Co.*, 249 Conn. 766, 795, 734 A.2d 112 (1999). "[A]lthough an opinion may appear to be in the form of a factual statement, it remains an opinion if it is clear from the context that the maker is not intending to assert another objective fact but only his personal comment on the facts which he has stated. . . . Thus, while this distinction may be somewhat nebulous . . . [t]he important point is whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *Goodrich* v. *Waterbury Republican-American, Inc.*, 188 Conn. 107, 111–12, 448 A.2d 1317 (1982).

Here, the court properly concluded that all three

statements made by the defendants regarding the plaintiff were defamatory. Specifically, in its memorandum of decision, the court set forth the necessary elements of defamation as well as the evidence that it would and would not rely upon when determining whether defamation occurred.[8] The court evaluated each element required to prove defamation and concluded that the statements were defamatory: "The statements to DePallo and Vrabel say directly [that the plaintiff] was a murderer or involved in the murder of Bill Smolinski. The statements made to DePallo and Vrabel were obviously 'published' to them. The statement made to the man at the gym was published to him. In all these situations, [the plaintiff] was identified to the listener, and since [the plaintiff] was being accused of murder or involved with murder, the defamations are per se accusations since murder clearly involves a crime of 'moral turpitude' or 'infamous penalty.' We do not have here mere opinion—[the plaintiff] was said to be a murderer or involved in a situation where murder occurred."

The court went on to determine that the statements were made with actual malice because "[t]here was reckless disregard of whether the statements that were alleged to have been made were truthful. We do not have a case of mere negligent utterances not based on fact but on suspicion and conjecture." Last, the court considered the defendants' hearsay argument regarding the statement to the man at the gym and determined that "[s]uch a defamatory statement is not hearsay in [this] slander action because the issue is whether the statement was made, not whether it was true . . . ." (Citations omitted.) We conclude that the finding by the court of defamation as to all three statements made by the defendants clearly established all four elements of defamation and was not clearly erroneous.

The defendants additionally claim that even if this court agrees that the trial court properly determined that these statements were defamatory, such statements do not support a claim for damages because the plaintiff suffered no resulting reputational harm. Our Supreme Court has noted that although injury to the plaintiff's reputation is an indispensable element of a defamation action, "[w]hen the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation." *Urban* v. *Hartford Gas Co.*, 139 Conn. 301, 308, 93 A.2d 292 (1952). In its memorandum of decision, the court explained that "[l]ibel and slander divide into the categories of per quod and per se. Defamations per quod are statements for which their defamatory character becomes apparent only through consideration of extrinsic facts and circumstances . . . . A statement which is defamatory by reason of innuendo falls within the category of defamation per quod. . . . [A] category encompassing defamation per se are statements charg-

ing the plaintiff with commission of a crime. . . . Traditionally, such statements are actionable per se only if they charge the commission of a crime of moral turpitude or infamous penalty . . . ." (Citations omitted; internal quotation marks omitted.) The court concluded, and we agree, that the defamatory statements made by the defendants here were actionable per se, and therefore, injury to the plaintiff's reputation is presumed. Thus, we agree with the court's finding of defamation by the defendants and the resulting damages to the plaintiff.

VI

DAMAGES CLAIM

The defendants last argue that the court erred in awarding damages to the plaintiff in the absence of any proffered evidence of damages. They claim not only that the plaintiff failed to produce any evidence of damages in discovery or at trial, but also that the court failed to explain how it arrived at the monetary figures of its award. We are not persuaded by their argument.

"The assessment of damages is peculiarly within the province of the trier and the award will be sustained so long as it does not shock the sense of justice. The test is whether the amount of damages awarded falls within the necessarily uncertain limits of fair and just damages. . . . [W]e cannot disturb the decision of the trial court unless there are considerations of the most persuasive character. . . . The trial judge has a broad legal discretion and his action will not be disturbed unless there is a clear abuse. . . . The evidence offered at trial must be reviewed in the light most favorable to sustaining the verdict." (Internal quotation marks omitted.) *Commission on Human Rights & Opportunities ex rel. Arnold* v. *Forvil*, 302 Conn. 263, 283, 25 A.3d 632 (2011).

"When the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation. He is required neither to plead nor to prove it. . . . The individual plaintiff is entitled to recover, as general damages, for the injury to his reputation and for the humiliation and mental suffering which the libel caused him." (Internal quotation marks omitted.) *Lyons* v. *Nichols*, 63 Conn. App. 761, 768, 778 A.2d 246, cert. denied, 258 Conn. 906, 782 A.2d 1244 (2001).

"[I]n order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights." (Internal quotation marks omitted.) *Berry* v. *Loiseau*, 223 Conn. 786, 811, 614 A.2d 414 (1992). "In awarding punitive damages . . . [t]he trial court has broad discretion in determining whether damages are appropriate. . . . Its decision will not be disturbed on appeal absent a clear abuse of discretion.

. . . Punitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights." (Citation omitted; internal quotation marks omitted.) *Bhatia* v. *Debek*, 287 Conn. 397, 420, 948 A.2d 1009 (2008). "Punitive damages, which in Connecticut are limited to attorney's fees less taxable costs . . . may be awarded whether the defamation is actionable per se or per quod. . . . Such damages, however, are not awarded as a matter of right, but rather as a matter of discretion, to be determined by the [court] upon a consideration of all the evidence . . . ." (Citations omitted; internal quotation marks omitted.) *DeVito* v. *Schwartz*, 66 Conn. App. 228, 236, 784 A.2d 376 (2001).

The damages awarded in this case were clearly within the province of the judge and fell within the "necessarily uncertain limits of fair and just damages." (Internal quotation marks omitted.) *Commission on Human Rights & Opportunities ex rel. Arnold* v. *Forvil*, supra, 302 Conn. 283. The court, after thoroughly stating its relevant findings of fact and bases upon which it found the defendants liable to the plaintiff for the intentional infliction of emotional distress and defamation, set forth its award. As to the plaintiff's claim of intentional infliction of emotional distress, the court awarded compensatory damages in the amount of $32,000, and as to her claim of defamation, the court awarded compensatory damages in the amount of $7500, for a total compensatory damages award in the amount of $39,500. Moreover, the court acted within its authority to add punitive damages to the award for attorney's fees and costs in an amount equal to one-third of the total compensatory damages award, or $13,166.67.[9] The damages awarded by the court can hardly be considered to "shock the sense of justice" under our standards of law.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The plaintiff also sued John Murray, the owner, publisher and editor of a monthly newspaper, the Waterbury Observer, for invasion of privacy and intentional infliction of emotional distress. Murray filed a motion to strike the claims against him, which the court granted on July 20, 2009. He then moved for summary judgment because all of the counts directed at him had been stricken by the court. The court granted Murray's motion for summary judgment on January 12, 2010. Thus, none of the claims in this appeal pertain to Murray.

[2] The plaintiff's employer, B and B Transportation, Inc., was an original plaintiff in this action, pleading claims against the defendants for trespass, and tortious interference with business relationships and expectancies. On July 30, 2011, B and B Transportation, Inc., withdrew its claims against the defendants and is no longer a party to this action.

[3] The plaintiff met Bill Smolinski during their mutual employment as bus drivers at B and B Transportation, Inc., and began dating. Shortly after they began dating, Bill Smolinski ended his employment with B and B Transportation, Inc., and his relationship with the plaintiff. About one year later, Bill Smolinski and the plaintiff began dating again. The plaintiff eventually broke up with Bill Smolinski because she "was older than him and [she] could not handle the age difference . . . ." The plaintiff reported to Waterbury police Sergeant Edward Apicella on August 3, 2005, during the course of the police department's investigation of Bill Smolinski's disappearance that "she [had] met Bill Smolinski and had known him for over a year from

the time that he went missing on 08/24/04, Tuesday. She said that she met him from driving a bus. She said that during the course of their friendship she began a relationship with him. She said that prior to her relationship with Bill she was having an affair with Chris Sorensen and she is currently continuing to have that affair. She said that she believed Bill suspected/ knew of her having an affair with Chris for a time but she didn't actually tell him until she went on a trip to Florida with Bill. She said that it came to [a head] when they went on a trip to Florida the week prior to August 22, 2004. She said that she was getting phone calls on her cell phone . . . while they were on a beach in Florida. Bill grabbed the cell phone from her and was trying to see who was calling her. [The plaintiff] said that when she tried to get the phone from him he hit her and they had a fight. She began to yell at people on the beach to call the police because Bill was not giving her cell phone. She never made a report to the police and she eventually got her phone back. Bill told her that he wanted to end the relationship because he wanted more out of it. He didn't want to be with her if the relationship was going nowhere. She agreed and they returned from Florida with Bill on August 22 (Sunday). [The plaintiff] went on to say that she had been married three times, she liked Bill but she didn't need to baby-sit a 31 year old guy who liked to drink and fight. She said that Bill used to go to the Outside Inn (Hamilton Ave.) and get into fights all the time. She also claimed that Bill started to smoke drugs (did not specify type). She said she was already involved with Sorensen as well. It was [Bill's] idea to break up but she agreed. . . . [The plaintiff] said that she got a call from Chris saying that someone left a message on his answering machine that said You better watch your back at all times. [The plaintiff] heard the message and she said that it was Bill Smolinski." The plaintiff's testimony conflicts with the preceding statement that she gave to the police, as she testified that she and "[t]he other man . . . had broken up months before [she and] Billy . . . even started seeing each other."

The trial testimony revealed that because of the plaintiff's alleged affair with Sorensen, a local, married politician, the defendants formed the belief "[t]hat [the plaintiff] was in a love triangle with their son and . . . another fellow . . . and that he had gone missing, and that they assumed and they thought that [the plaintiff] had done something to him that he had gone missing."

[4] The evidence shows that the missing person posters that were hung by the defendants consisted of photographs and physical descriptions of Bill Smolinski as well as information about his disappearance, an offer of a reward, and contact information to report tips to the police.

[5] Although the defendants did not expressly invoke the fourteenth amendment to the United States constitution, it is axiomatic that the first amendment applies only to the states through the due process clause of the fourteenth amendment. For convenience, we will refer to this claim as the defendants' first amendment claim.

[6] See, e.g., *State* v. *Blue*, 230 Conn. 109, 113 n.3, 644 A.2d 859 (1994) ("[T]he transcript indicate[d] that it was the 'Court' that said 'I understand what you're saying, yes.' It is clear, however, from the response and its context that this was a typographical error, and that in fact the response was that of the defendant.").

[7] The defendants proffer the following theories as alternative causes for the plaintiff's emotional distress: the death of the plaintiff's daughter by suicide one month before Bill Smolinski's disappearance; the death of the plaintiff's son by drug overdose in the year following the disappearance; the death of another one of the plaintiff's children; the plaintiff's breakup with Bill Smolinski; and the plaintiff's publicly revealed relationship with Sorensen.

[8] The court explained that when determining whether defamation occurred here, it would not rely upon the testimony of Cohen, the plaintiff's employer and the owner of B and B Transportation, Inc., in which he described telephone calls he received from customers of his school bus company expressing their concerns about the plaintiff because none of these customers was identified or called as a witness in this case. The court also did not consider the statements made by the defendants on certain television programs or to the Waterbury Observer in the plaintiff's defamation claim because no transcripts of the television programs were introduced into evidence and the articles published by the Waterbury Observer do not focus on the plaintiff "as the perpetrator of a crime or as one involved in it."

[9] See *DeVito* v. *Schwartz*, supra, 66 Conn. App. 236 ("Punitive damages, which in Connecticut are limited to attorney's fees less taxable costs . . .

may be awarded whether the defamation is actionable per se or per quod. . . . Such damages, however, are not awarded as a matter of right, but rather as a matter of discretion, to be determined by the [court] upon a consideration of all the evidence . . . .” [Citations omitted; internal quotation marks omitted.]).

---